**STATE of Missouri, Respondent,**

v.

**Andre D. MORROW, Appellant.**

No. 79112.

Supreme Court of Missouri,
En Banc.

April 21, 1998.

As Modified May 26, 1998.

Henry B. Robertson, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

PRICE, Judge.

A jury convicted Andre Morrow of first degree murder pursuant to section 565.020, RSMo 1994, for murdering John Koprowksi on April 13, 1994. Morrow was also convicted of one count of robbery in the first degree, section 569.020, RSMo 1994, one count of robbery in the second degree, section 569.030, RSMo 1994, two counts of armed criminal action, section 571.015, RSMo 1994, and two counts of felony stealing, section 570.030, RSMo 1994. The trial court sentenced Morrow to death for Koprowski's murder and a total of 170 years plus life for the other offenses.

This Court has exclusive appellate jurisdiction because a death sentence was imposed. Mo. Const. art. V. sec. 3. We affirm.

## I. Facts

On April 10, 1994, twenty-four year old Andre Morrow was introduced to Richard Gooch. Gooch's apartment in St. Louis was known as a safe place where people could smoke cocaine in "quietness and peacefulness." Morrow took advantage of this atmosphere and smoked cocaine with Gooch for much of the afternoon. Eventually, Morrow left Gooch's "to go get some money."

In the early hours of April 11, 1994, Morrow went to an Amoco gas station and stole Lisa Smith's Chevy Nova, while Smith paid for her gasoline. Morrow returned to Gooch's with Smith's car and a black purse. Informing Gooch that he was going to get more money, Morrow left and traveled to Northwest Plaza. Still in Smith's car, Morrow drove close to Yn Ye Kuo—who was walking towards the restaurant where she worked—and asked, "Where's the Sears?" Morrow then grabbed her purse and drove away. Morrow returned to Gooch's later that morning with Kuo's purse and about $500. He told Gooch, "Pops, when I go for it—when I go get it, I get it." He then gave Gooch $40. Gooch and Morrow passed the remainder of the day smoking cocaine.

The following afternoon Morrow and his friend Mario Page abandoned Smith's car and stole Robert Herod's Fiero from in front of Herod's apartment. Later that afternoon,

Morrow and Page purchased a .38 caliber pistol. The two then traveled to the corner of Cora and Maragaretta, in the City of St. Louis, and saw eighteen year old Roamel Abercrombie. Abercrombie was walking to a nearby store to purchase some orange juice. He was carrying one dollar. Morrow got out of the car, approached Abercrombie, and said "Give me all your shit, Give me all you got. If you want, I'll shoot your ass." Morrow fired a shot into the air, scattering the people in the area. Morrow marched Abercrombie to a nearby vacant lot and demanded his money. Abercrombie gave Morrow his dollar. Morrow took Abercrombie farther into the lot and murdered him, shooting him in the back of the head.

Morrow then told Page that they needed to get out of town. They drove to Belleville, Illinois, where they left Herod's car and stole Fred Maston's Oldsmobile Cutlass. They later returned to Gooch's with more cocaine. Morrow explained to Gooch that he had gotten into a misunderstanding with regards to a drug deal and he had to "put the little guy to sleep."

That night Morrow went to a Shell station and approached Marsha Timm, while she was pumping gasoline into her car. Morrow stuck a gun in the side of her abdomen and said, "Give me you're [sic] handbag or I'll shoot." After initially refusing, Timm relented and let Morrow take her purse.

Sometime after midnight, Page stole Pornfiro Pinchay's Toronado from a parking space near Pinchay's home. (Morrow had abandoned Maston's car after it developed a flat tire.) At about 4:00 a.m., Morrow and Page left Gooch's apartment in Pinchay's car. Morrow and Page attempted to steal a 1989 Camero that belonged to the wife of Brad Rosenthal. They abandoned this plan after realizing that Rosenthal was watching them from his living room window. They later found a truck they wanted to steal at a Mobil station. This plan, however, was also abandoned when the owner returned to the truck.

Committed to stealing another automobile, Page and Morrow continued their search at the YMCA parking lot, in Brentwood. There, they came upon John Koprowski and his new Jeep Grand Cherokee. Morrow ap-

proached Koprowski and demanded his keys. Page also approached to take Koprowski's wallet. Koprowski responded that, "I'm not gong to let you do this" and grabbed Morrow's gun. He attempted to fight off Morrow and Page, who were both biting him. Morrow regained control of the gun and grabbed Koprowski's keys from the ground. Koprowski remained on the ground. As Morrow stood above Koprowski, he shouted "Get up, you son of a bitch"—then he shot Koprowski once in the head. The bullet entered Koprowski's head just above the tip of his nose and traveled through his body until it came to rest between Koproswki's ribs in his back. Morrow and Page jumped in Koprowski's jeep and, before leaving, observed that Koprowski was still alive, staggering through the lot.

William Lindenmayer heard the gunshot and drove into the YMCA's parking lot. He saw Koprowski stagger away from the Toronado, then collapse. Lindenmayer placed his jacket over Koprowski and then went into the YMCA for help. An ambulance arrived and took Koprowski to St. Mary's Hospital. Koprowski bled to death from the gunshot wound.

Morrow and Page continued on. Now in Koprowski's jeep, Morrow drove to downtown St. Louis. Morrow found Sandra Merriman at the Southwestern Bell building. Merriman was using the building's revolving door to go to work when it suddenly stopped moving. Merriman turned to see Morrow with his hand on her purse. Morrow said, "Give me that, motherfucker." Morrow then pulled Merriman backwards, took her purse, and left in Koprowski's jeep.

Morrow returned to Gooch's later that morning. Page sold their gun for drugs at a nearby apartment. Morrow became irritated with Page because he was unsatisfied with the quality and quantity of the cocaine Page had purchased. Page then left to burn Koprowski's jeep.

Morrow grew concerned after seeing news reports covering Koprowski's murder. He discussed with Gooch his need to get out of town. He considered going to Kansas City to rob a bank. Morrow also talked of putting Page "to sleep" before he left. This caused Gooch to fear for his own safety. Gooch left Morrow at his apartment and went to the police.

Morrow confessed to all the aforementioned crimes. At trial in St. Louis County he was charged with the robbery and murder of John Koprowski, the stealing of Lisa Smith's car, the stealing of Robert Herod's car, the forcible stealing of Yn Ye Kuo's purse, and two attendant counts of armed criminal action.[1] Morrow's defense at trial was that his cocaine addiction, coupled with a "mental or emotional disturbance," rendered him unable to deliberate. Therefore, he argued, it was impossible for him to form the specific intent necessary to support a charge of murder in the first degree. *See* sec. 565.020 ("A person commits the crime of murder in the first degree if he knowingly causes the death of another person *after deliberation* on the matter." (emphasis added)).

The jury convicted Morrow of first degree murder and found him guilty on all other charges. The court found Morrow to be a class X offender, based on fourteen prior convictions. In addition to the sentence of death, Morrow received fifty years each on two counts of armed criminal action, twenty years each on two counts of stealing a motor vehicle, and thirty years for robbery in the second degree.

## II.

### Issues on Appeal

Morrow alleges the following instances of trial court error: 1) the court erred by admitting evidence of the uncharged crimes of stealing, robbery, and murder because the offenses were not logically relevant nor necessary to prove the charged crimes; 2) the court erred in denying his motion for misjoinder and abused its discretion in refusing

1. In the city of St. Louis, Morrow pled guilty to first degree murder and armed criminal action for the murder of Roamel Abercrombie. He was sentenced to life without parole on the murder charge and life for armed criminal action. On the day he pled guilty to these charges, the City of St. Louis dismissed the charges regarding the Timm and Merriman robberies.

to sever counts V–VII because those offenses were not parts of the same transaction or common scheme or plan and were not of the same or similar character; 3) the court erred in giving the state's version of MAI–CR3d 310.12, which erroneously applied the law of other crimes because it allowed other crimes to be considered on theories of motive and intent which are unsupported by the record; 4) the court erred in refusing to let Morrow question prospective jurors on whether they could consider mitigation of punishment although he had another murder charge pending and whether they could consider the difference between first and second degree murder because this denied Morrow the ability to intelligently exercise challenges for cause and peremptory strikes; 5) the court abused its discretion in overruling Morrow's objection to the admission of his fingerprint cards as evidence because they were prejudicial evidence of an unrelated offense; 6) the court erred in overruling Morrow's hearsay objection to a statement by Mario Page because this denied him the right to cross examine the witness against him; 7) the court erred in overruling Morrow's objections to testimony of the fear felt by witnesses Charles, Kuo, and Browning because it was irrelevant and served no purpose but to inflame the jury; 8) the court clearly erred in sustaining the state's peremptory strikes of black venirewomen Gordon and Irving because the state's explanations were pretextual, in violation of *Batson*; 9) the court abused its discretion in allowing the testimony of Everlida Abercrombie and admitting a photograph of Roamel Abercrombie because both constituted impermissible victim impact evidence; 10) the court erred in admitting victim impact testimony of Pamela Koprowski because the statute and the evidence exceed what is allowed by the Eighth and Fourteenth Amendments; 11) the court erred in overruling Morrow's objections to the state's cross-examination of Dr. Cuneo with a presentence report and the admission of that report into evidence because the state failed to lay a foundation showing that Cuneo had seen or relied on the report, and this brought hearsay and incompetent opinion evidence to bear on punishment; 12) the trial court erred in submitting five statutory aggravating circumstances over objection because they were unsupported by the record, multiplicative, and failed to narrow the sentencer's discretion; 13) the court erred by overruling Morrow's motion to ask the court to refrain from giving MAI–CR3d 313.40 to 313.48 because the statutory and instructional scheme violates the Eighth Amendment because it allows a single juror to block consideration of mitigating evidence and prevent a life sentence; 14) the court erred in overruling Morrow's objections to the state's penalty phase closing argument because the remarks were unsupported by evidence, inflammatory, and urged the death penalty based on factors not relevant to the crime or the character of the defendant in violation of the Eighth Amendment and due process of law; 15) the trial was infected with passion and prejudice, the statutory aggravating circumstances were insufficient to support a sentence of death, and the death sentence is disproportionate to that imposed in other similar cases.

### *Standards of Review*

On direct appeal we review the trial court " 'for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial.' " *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc 1996) (citation omitted). We review the facts in the light most favorable to the verdict. *State v. Hutchison*, 957 S.W.2d 757, 759 (Mo. banc 1997). The trial court is vested with broad discretion to admit evidence at trial and we will only reverse if this discretion was clearly abused. *State v. Simmons*, 944 S.W.2d 165, 178 (Mo. banc 1997).

"To preserve an objection to evidence for review, the objection must be specific, and the point raised on appeal must be based upon the same theory." *State v. Driver*, 912 S.W.2d 52, 54 (Mo. banc 1995). Issues that were not preserved may be considered only if the court finds that manifest injustice or miscarriage of justice has resulted therefrom. *See* Rule 30.20; *State v. Simmons*, 955 S.W.2d 729 (Mo. banc 1997).

## III. Evidence of Uncharged Crimes

Morrow maintains that the trial court erred by admitting evidence of the uncharged crimes that Morrow participated in. Specifically, Morrow contests the admission of evidence regarding the robbery and murder of Roamel Abercrombie, the theft of Fred Maston's Oldsmobile, the theft of Pornfiro Pinchay's Toronado,[2] the robbery of Marsha Timm, and the robbery of Sandra Merriman. We find this evidence admissible to present the jury a complete and coherent picture of the charged crimes and to rebut Morrow's contention that he lacked the ability to deliberate.

### Evidence of a Coherent Picture

■ We addressed this issue in a similar context in *State v. Harris*, 870 S.W.2d 798, 810 (Mo. banc 1994), *cert. denied*, 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994). In *Harris*, evidence was admitted in a murder case that the defendant had said he wanted guns "to do a drive-by shooting" and that he was going to a lounge to kill another individual. We stated,

> The general rule concerning the admission of evidence of uncharged crimes, wrongs, or acts is that evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes. *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993). Exceptions to the general rule provide for the admission of evidence that tends to establish motive, intent, the absence of mistake or accident, or a common plan or scheme. *Id.* An additional exception is recognized for evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged. *State v. Wacaser*, 794 S.W.2d 190, 194 (Mo. banc 1990); *State v. Flenoid*, 838 S.W.2d 462, 467 (Mo.App.1992); *State v. Davis*, 806 S.W.2d 441, 443 (Mo.App.1991). This evidence is admissible to present a complete and coherent picture of the events that transpired. *Flenoid* at 467. In this case, the evidence of Harris' planned use of the gun to commit a drive-by shooting was interconnected to and nearly contemporaneous with the murder of Willoughby, and it set the context for that offense. It is evidence that added to the complete and coherent picture of the murder and was, therefore, properly admitted.

*Id.See also State v. Skillicorn*, 944 S.W.2d 877, 887 (Mo. banc 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 568, 139 L.Ed.2d 407 (1997); *State v. Roberts*, 948 S.W.2d 577, 591 (Mo. banc 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 711, 139 L.Ed.2d 652 (1998).

As in *Harris*, these uncharged crimes were admissible to present to the jury a complete and coherent picture of the Koprowski robbery and murder, the Kuo robbery, and the theft of Lisa Smith's and Robert Herod's automobiles. All the crimes here, charged and uncharged, were part of a three day drug binge and crime spree. Between the early hours of April 11 and the morning of April 13, Morrow murdered two people, stole four cars, attempted to steal two more cars, and robbed three people. The time between the uncharged crimes and the charged crime of Koprowski's murder was less than thirteen hours. Although Morrow would have liked to limit the focus of the jury's attention to only five of the many crimes he committed during the crime spree, those crimes alone would not have fully and fairly presented a complete and coherent picture of the crimes charged and the whole truth to the jury.

### Evidence of Deliberation

■ Morrow put his ability to deliberate at issue from his opening statement to his closing argument.[3] Morrow insists that as a result of his cocaine binge, he lacked the ability to deliberate. One expert witness testified that Morrow was reduced to an automaton, and that the cocaine rendered

---

2. The admissibility of evidence regarding the theft of Pinchay's car need not be discussed as it was Mario Page, not Morrow, who stole Pinchay's car. The record shows that Morrow was at Gooch's when this crime occurred. Morrow was not prejudiced by this evidence.

3. What we said in *Roberts* is applicable here: "Because of what the jury could see so clearly from the physical evidence, [defendant] decided to defend himself on the one issue the jurors could not see—his mental state at the time of the murder." *Roberts*, 948 S.W.2d at 586.

him incapable of deliberating prior to his shooting of Mr. Koprowski.

Because deliberation is something the jurors can not see and is seldom capable of direct proof, "[f]indings of deliberation ... depend usually 'upon an inference reasonably drawn from the evidence and circumstances surrounding the act.'" *State v. Kenley*, 693 S.W.2d 79, 81–82 (Mo. banc 1985), *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900 (1986) (citation omitted). In *Roberts*, appellant murdered a woman, then stole her car. There we held that evidence of appellant's statement that he wanted a gun to kill the person that later stole his victim's car from him was admissible to show a coherent picture of the charged crime and to show that the defendant had the *ability* to deliberate. *Roberts*, 948 S.W.2d at 591. *See also Skillicorn*, 944 S.W.2d at 887 (evidence of a subsequent assault was relevant to establish defendant's deliberation in a murder earlier that day).

Morrow argues that the only relevant inquiry is into his mental state at the time he murdered Koprowski. Morrow himself, however, broadened this inquiry by arguing that his cocaine addiction rendered him incapable of deliberating over a long period of time—a period of time that included the time when he murdered both Koprowski and Abercrombie.

A jury could see that during this crime spree Morrow was undertaking acts that involved thought and deliberation. This evidence demonstrated that Morrow was not "reduced to an automaton." For example, evidence of deliberation is found in the circumstances surrounding the Abercrombie murder and the theft of Maston's Oldsmobile. An inference of deliberation arises when observing the way Morrow marched Abercrombie to a vacant lot before killing him. In addition, there was evidence of his attempts to cover up his crime. Immediately after murdering Abercrombie, Morrow reasoned that he needed to get out of town. He did just that, leaving the car used when murdering Abercrombie in Illinois and stealing Maston's Oldsmobile to return to St. Louis. Further, when commenting on the murder, Morrow spoke of a misunderstanding and, subsequently, having to "put the little guy to sleep." Instead of speaking of what he instinctively did or what suddenly happened, Morrow spoke of the murder as something he "had to do." This indicated that he felt that "killing another human being was the appropriate response...." *Roberts*, 948 S.W.2d at 591. A jury could reasonably infer that Morrow deliberated when deciding what he "had to do." [4]

Other examples of Morrow's ability to deliberate are found in the circumstances surrounding the robberies of Marsha Timm and Sandra Merriman. Timm and Merriman were deliberately selected by Morrow because they were both carrying handbags and both appeared vulnerable. Morrow waited until Merriman was inside a revolving door before he robbed her and he robbed Timm at night, while she was by herself pumping gas into her car. As with the other crimes, these circumstances show that Morrow was not an "unthinking zombie" but a person capable of evaluating opportunities and taking deliberate actions.

The evidence was also properly used to impeach the credibility of Morrow's pharmacologist, Roswell Evans, who said that Morrow was unable to deliberate. Questioning about this evidence made Evans concede that Morrow engaged in "purposeful" behavior and that Morrow may have been making some judgments in the period of time surrounding the murder of Koprowski.

■ A tension necessarily exists between excluding evidence of uncharged crimes and admitting evidence to show the complete and coherent picture of the crime at issue. Admission of such evidence requires a "balancing of the effect and value" of the evidence and "rests within the sound discretion of the trial court." *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993). Special care should be taken by the trial court in determining

---

4. Specific evidence that Morrow was capable of deciding that the opportunity was not right to commit a particular crime included his decision not to steal Brad Rosenthal's wife's car after realizing that Rosenthal was watching him and his decision not to steal a truck from a Mobil service after the owner returned to the truck.

this balance, especially when the evidence of the uncharged crimes extends too far in time or nature from the crime at issue. Here, the evidence in question was probative of the issues of deliberation and was so intertwined with the evidence of the charged crimes that it easily passes the test set out in *State v. Harris, State v. Skillicorn, State v. Roberts,* and*State v. Bernard,* as well.

The trial court did not abuse its discretion. Point denied.

### IV. Joinder & Severance

Morrow maintains that the trial court erred by refusing to dismiss the charges against him for misjoinder and that it abused its discretion by denying his motion to sever. Whether joinder is proper or improper is a question of law. *See* Rule 23.05; *State v. Simmons,* 815 S.W.2d 426, 430 (Mo. banc.1991). If joinder is improper, then severance is required. *Id.* However, even if joinder is proper, the trial court may sever the charges if it believes the defendant will suffer substantial prejudice if the charges are not tried separately. Rule 24.07. The decision regarding severance is left to the sound discretion of the trial court. *State v. McCrary,* 621 S.W.2d 266, 272 (Mo. banc 1981) (citation omitted).

#### *Joinder*

Morrow maintains the trial court erred in joining the charges relating to the robbery and murder of Koprowski with the charges of stealing Smith's car, forcibly stealing Kuo's purse, and stealing Herod's car. We favor the liberal joinder of criminal offenses. *State v. Simmons,* 815 S.W.2d 426, 428 (Mo. banc 1991). Rule 23.05 permits joinder of two or more acts that "are connected or that constitute parts of a common scheme or plan." "Connected" is defined as: "[j]oined; united by junction, by an intervening substance or medium, by dependence or relation, or by order in a series." Black's Law Dictionary 302 (6 th ed.1990). In Webster's, "connected" is defined as: "joined or linked together a series, having the parts or elements logically related a view of the problem or continuous." Webster's International 480 (3d ed.1981).

The charged offenses are all connected. The offenses are connected in time. The two robberies, the two car thefts, and the murder were not isolated acts, but part of a crime spree that lasted less than three days. The offenses were a continuous chain of criminal activity, drug use, robbery, and murder. The offenses are connected in that they all occurred immediately after Morrow first met Richard Gooch and discovered that Gooch had a comfortable place to smoke cocaine. During those three days, Morrow never even changed clothes. The crime spree did not end until Gooch himself turned Morrow over to the police. The offenses are connected in manner, in that they are all characteristic of Morrow's activities during this time—stealing cars and purses. The offenses are connected in that they were committed with a similar motive—to procure funds to buy cocaine. Finally, the offenses are connected by their dependence and relationship to one another. Morrow used the car he stole from Smith to rob Kuo of her purse and Herod of his Fiero. Morrow used Herod's Fiero to steal Maston's Cutlass. Because of the disablement of Maston's Cutlass, Morrow's accomplice, Mario Page, stole Pinchay's Toronado. Morrow and Page then used Pinchay's Toronado to rob and murder Mr. Koprowski.

Because the charged crimes are all "connected," they were properly joined. The trial court did not err. Point denied.

#### *Severance*

Morrow claims, in the alternative, that the trial court abused its discretion by denying Morrow's motion for severance. Severance is proper only if the defendant shows that he will suffer substantial prejudice if the offenses are not tried separately and the court finds the existence of bias or discrimination requiring separate trials of the offenses. Rule 24.07.

In determining whether Rule 24.07 demands severance in a particular case, we look at the number of offenses joined, the complexity of the evidence, and the likelihood that the jury can distinguish the evidence and apply it, without confusion, to each offense. *See State v. Conley,* 873 S.W.2d 233,

238 (Mo. banc 1994); *McCrary,* 621 S.W.2d at 272. In addition, we have recognized that "any prejudice may be overcome where the evidence with regard to each crime is sufficiently simple and distinct to mitigate the risks of joinder." *Conley,* 873 S.W.2d at 238.

■ The evidence relating to each crime is "simple and distinct." Morrow admitted to his involvement in all the charged crimes and there are no allegations of confusion on the part of the jury in sorting through the evidence with regards to each crime. The trial court did not abuse its discretion by denying Morrow's motion to sever. In fact, as discussed before, the evidence of these crimes, whether charged together or not, was necessary to provide the jury a complete and a coherent picture of the crime charged and was relevant to Morrow's deliberation defense. Point denied.

## V. Jury Instruction

■ Morrow alleges trial court error in its submission of a jury instruction that allowed the other crimes evidence to be considered on the issue of motive and intent. The court's instruction, an alternative version to MAI–CR3d 310.12, stated:

> If you find and believe from the evidence that the defendant was involved in offenses other than the one [sic] for which he is now on trial, you may consider that evidence on the issue of *motive or intent* or presence of a common scheme or plan of the defendant. You may not consider such evidence for any other purpose.

Morrow maintains that the theories of motive and intent are not supported by the record.[5] First, Morrow disregards the fact that the instruction told the jury that it could consider uncharged crimes evidence on the issue of motive *or* intent, not motive *and* intent. Second, as decided in Point III, *supra,* the jury could properly have considered the uncharged crimes evidence to infer that Morrow had the ability to deliberate when murdering Koprowski. Intent is necessarily a part of reflection, or deliberation. Since the jury could properly have considered other crimes evidence on the issue of deliberation,

it could also properly have considered other crimes evidence on the issue of intent. Since the evidence is clearly admissible for that purpose, the trial court did not err by including the theory in its jury instruction. Point denied.

## VI. Voir Dire

■ Morrow alleges that the trial court refused to allow him to question prospective jurors on whether they could consider mitigating evidence in light of the fact that he had another murder charge pending and whether they could consider the difference between first and second degree murder. Morrow contends that, subsequently, he was unable to exercise his challenges for cause and peremptory strikes intelligently. What questions may be asked during voir dire is left to the trial court. *State v. Copeland,* 928 S.W.2d 828, 852 (Mo. banc 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 981, 136 L.Ed.2d 864 (1997). "We review the trial court's ruling for abuse of discretion and ask 'whether there is a real probability of injury to the [defendant].'" *State v. Brown,* 902 S.W.2d 278, 285 (Mo. banc 1995), *cert. denied,* 516 U.S. 1031, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995) (citation omitted).

### *Mitigating Evidence*

■ Morrow contends that the trial court abused its discretion by refusing to allow him to question prospective jurors as to whether they could still consider mitigating evidence knowing that he had another murder charge pending. The record shows, however, that this objection was not preserved. The trial court did not prohibit Morrow from asking this question, but merely prohibited him from asking it during small group voir dire. The trial court explained:

> I don't believe you can be specific in discussing what matters of evidence in this particular portion of the voir dire examination. This has to do with their philosophical, religious, personal feelings about the death penalty, generally.... But at least at this stage of the proceeding I think that it exceeds the scope of what I intended this voir dire to be, this threshold voir dire, on

5. Morrow conceded the common scheme or plan

theory for the purposes of this instruction.

death penalty. And so I'm going to sustain her objection and we can discuss it at the end of the day when we have a little more time, rather than up here at the sidebar.

The trial court obviously wanted to wait until the prospective jurors were out of the small groups before allowing this question to be asked. Morrow does not point to any place during the general voir dire where he was precluded from addressing the matter in question. In fact, the record shows that Morrow was allowed during general voir dire to inquire how evidence of another murder charge would affect the prospective jurors' ability to consider second degree murder.

Because we find no manifest injustice or miscarriage of justice, we do not review for plain error. *See* Rule 30.20. Point denied.

### *Element of Deliberation*

■ Morrow maintains the that the trial court prohibited questioning regarding the difference between first and second degree murder. The record shows that the court refused to allow Morrow to refer to the element of deliberation. The trial court also refused to provide the prospective jurors with a definition of first and second degree murder during voir dire. Morrow claims that these restrictions prohibited him from intelligently exercising his peremptory and for cause strikes.

■ " 'Counsel may not tell prospective jurors what law will be applied in the case or what instructions will be given.' " *Brown,* 902 S.W.2d at 286 (citation omitted). Further, the record undermines Morrow's arguments because it reveals that the trial court went to great lengths to help Morrow's counsel come up with proper questions to probe the prospective jurors' feelings on this matter. In fact, it was Morrow who abandoned this line of questioning after being permitted to ask the following questions:

"If the court were to instruct you on different degrees of homicide, can you keep an open mind and listen to the evidence that you hear and apply that to those instructions?"

"Is there anyone here who cannot consider a lesser degree of homicide when someone is charged with murder in the first degree?"

"Is there anyone who believes that if a gun is involved in a shooting it was a planned act, simply because a gun was involved in the shooting?"

"I explained to you that there were different degrees of homicide ... And in all of these homicides a gun could be used, a weapon or gun involved. Do any of you believe just because a gun is used that it is a murder first degree case, and that you would not consider a lesser degree of homicide?"

The trial court did not abuse its discretion. Point denied.

### VII. Fingerprint Evidence

■ Morrow contends that the trial court erred when it admitted into evidence Morow's 1987 fingerprint cards. The fingerprints on these cards matched those prints lifted from Brad Rosenthal's wife's Camero. The cards were dated "1987" and showed that Morrow used an alias—"Eric Stubbs." Morrow argues that the cards were prejudical evidence of an unrelated offense.

■ Fingerprint cards, in and of themselves, do not constitute evidence of a prior crime. *See State v. Blair,* 631 S.W.2d 91, 94 (Mo. App.1982); *State v. Perryman,* 851 S.W.2d 776, 779 (Mo. App.1993). Likewise, use of an alias does not constitute " 'clear evidence associating appellant with other crimes.' " *Brown,* 902 S.W.2d at 287 (citation omitted).

The fingerprint cards here, however, were introduced by a police officer who testified that as an "intake officer" he would obtain the subject's name for the fingerprint card off the "booking sheet." Morrow argues that this testimony put the neutrality of the fingerprint cards at issue—as the jury could have inferred that Morrow was booked for a crime in 1987. Morrow relies on Georgia precedent as support for his contention that the fingerprint evidence "prejudicially put [his] character on trial." However, the case he cites, *Manor v. State,* 223 Ga. 594, 157

S.E.2d 431 (Ga.1967), *vacated in part by Manor v. Georgia*, 408 U.S. 935, 92 S.Ct. 2856, 33 L.Ed.2d 750 (1972), undermines his argument as it demonstrates when fingerprint cards can, in fact, be prejudicial. In *Manor*, the fingerprint card included three aliases, the defendant's FBI number, and listed charges of rape and possession of whiskey. *Id.* 157 S.E.2d at 436. Similar facts are not present here. Morrow's fingerprint cards did not mention any crimes. The trial court did not abuse its discretion. Point denied.

## VIII. Hearsay Testimony of Officer Campbell

### *Statement of Mario Page*

■ Morrow contends that impermissible hearsay, implicating Morrow in the Abercrombie murder, was admitted into evidence. Officer Campbell testified that he told Morrow that "Mario Page had implicated him in the shooting of Roamel Abercrombie." Morrow contends that Page's statement was hearsay and its admission was prejudicial.

Morrow has admitted to murdering Abercrombie and has stood by his confession. Morrow could not have been prejudiced by Campbell's testimony that Page implicated Morrow in that murder. *See Cruz v. New York*, 481 U.S. 186, 192, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987). We find neither prejudice nor an abuse of discretion in the admission of this evidence. Point denied.

### *Lineup Testimony*

■ Morrow contends that Officer Campbell's testimony regarding Dante Charles and Yn Ye Kuo's reactions at a police lineup was inadmissible hearsay. Campbell testified that Charles (who witnessed the Abercrombie shooting) "began to cry and shake" when

Morrow stepped forward at the lineup. Similarly, Campbell testified that Kuo backed away from the window, became weak kneed, and appeared to be fainting when she observed Morrow.[6] Neither Charles nor Yn Ye Kuo made an identification of Morrow. Morrow argues that the state's use of these reactions as evidence of identifications constituted hearsay and was prejudicial because it portrayed him "as so evil and dangerous that he inspired spontaneous reactions of fear in people."

This testimony does not fall under the commonly understood definition of hearsay—an out of court *statement* offered to prove the truth of the matter asserted. Neither Charles nor Kuo made a statement or assertion, they instead displayed physical reactions upon observing Morrow. The question of whether non-assertive conduct qualifies as hearsay has been discussed by evidence scholars for years. *See* 5 Wigmore, *Evidence* 1362, n.1 (Chadbourn rev.1974).[7] We need not enter this debate because even assuming that the testimony was improper hearsay,[8] it could not prejudice Morrow.

To the extent the testimony implicated Morrow in the Abercrombie murder and the Kuo robbery, Morrow already confessed to those crimes. *See Cruz*, 481 U.S. at 192, 107 S.Ct. 1714. To the extent that the testimony might have implied a fearful reaction, the crimes themselves would naturally inspire fear in anyone witnessing them. There was no prejudice to Morrow in the admission of the evidence. Point denied.

Morrow claims that the testimony was irrelevant. This argument is unpreserved as it was not raised in his motion for new trial. Because we find no manifest injustice or miscarriage of justice, we do not review for plain error. *See* Rule 30.20.

**6.** Campbell, of course, was available for cross examination as to the accuracy of his observations.

**7.** To briefly summarize, the debate centers around the question of whether the trustworthiness that is inherent in conduct that was not intended to be an assertion outweighs the interest in putting testimony under the scrutiny of cross examination.

**8.** This testimony may fall into the excited utterances hearsay exception. *See State v. Meyer*, 694 S.W.2d 853, 856, n. 2 (Mo.App.1985) ("To qualify under this exception, the utterance first must have been made as a spontaneous reaction to a startling occurrence or event. Second, the event must have been sufficiently startling to render inoperative the normal reflective thought process of an observer." *citing* McCormick *Evidence*, Sec. 297 (3d ed.1984)).

## IX. Testimony of Ms. Browning

 Morrow challenges the admission of Ms. Browning's testimony. Ms. Browning testified that she was at the YMCA parking lot and witnessed much of the exchange between Morrow and Mr. Koprowski. After parking close to Mr. Koprowski and realizing something was wrong, Browning said she got back in her car and drove around the building—hoping to frighten away Morrow. Browning returned and got out of her car and, eventually, witnessed Morrow shoot Koprowski.

Browning testified that, after the shooting, she hid behind her car because she was afraid of being shot. She also testified that she felt guilty for driving around the building, because she felt that another course of action may have saved Koprowski's life. In fact, Browning felt so guilty that in her initial police report she did not mention driving around the building.

Morrow contends that Browning's testimony regarding her fear of being shot and her guilt over not doing more were irrelevant. As in the preceding point, Morrow argues that the evidence was prejudicial because it portrayed him as evil and inspiring fear in people.

Morrow's arguments are without merit. Browning's testimony as to her fear of being shot was relevant to show why she was behind her car. Further, Browning's feelings of guilt and remorse were relevant to explain why she failed to tell the police that she drove around the building. *See State v. Spinks*, 629 S.W.2d 499, 502–503 (Mo.App. 1981). Moreover, Morrow was not prejudiced by this testimony because it merely points out the obvious—that someone who just witnessed a murder would fear for their life.

We find neither abuse of discretion nor prejudice in the admission of Browning's testimony. Point denied.

## X. *Batson* Challenges

Morrow alleges the trial court erred by overruling two of his three *Batson* challenges. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The challenges concerned the state's use of peremptory strikes on two black venirewomen.

 We defer to the trial court in these matters, and will overturn its decision only upon a showing of clear error. *State v. Smith*, 944 S.W.2d 901, 912 (Mo. banc 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 377, 139 L.Ed.2d 294 (1997). The trial court commits clear error when " 'although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.' " *Id.* (*citing State v. Antwine*, 743 S.W.2d 51, 66 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988)). Further, "the justification for a peremptory strike need not rise to the level of justification for a challenge for cause." *Smith*, 944 S.W.2d at 913 (*citing Batson*, 476 U.S. at 97, 106 S.Ct. 1712). When faced with a *Batson* challenge, the state must present a "reasonably specific and clear race neutral explanation for the strike." *State v. Parker*, 836 S.W.2d 930, 939 (Mo. banc 1992), *cert. denied,* 506 U.S. 1014, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992). If the state does this, then it is the defendant's burden to show that the state's reasons were pre-textual and that the strikes were racially motivated. *Id.*

### *Ms. Essie Gordon*

 The state maintains they struck Ms. Gordon because she appeared troubled with the death penalty and stated that she would first have to know defendant's motive before she could consider it. The relevant questioning follows:

Q: Will you be able to listen to the evidence and consider the death penalty in this case?

A: Yes, I can.

Q: Okay. When you say—

A: The death penalty or life imprisonment.

Q: You would able to consider both?

A: *I don't know,* I'm thinking more or less I have to listen to it to see what really happened.

Q: Right .... do you have some personal feelings about the death penalty?

A: No.

Q: Okay. Either way?

A: No.

Q: It's something you could consider?

A: Yes.

The state maintains that during questioning "she looked very troubled" and would not look up when the topic of the death penalty arose. While acknowledging that Ms. Gordon did say she could consider it, the prosecutor believed her to be hesitant and reluctant. The trial judge allowed the strike stating "my memory is the same as [the prosecutor's] that the lady equivocated a great deal, asking questions in response to questions."

Ms. Gordon's hesitation and body language during questioning was a legitimate basis for using a peremptory strike. "[E]ven if the prosecutor's perception of the venireperson is based on past experience, 'hunches,' or 'horse sense,' the perception can survive *Batson* if it is based on a racially-neutral factor." *Smith*, 944 S.W.2d at 912. Further, because of the "subjective nature of peremptory challenges" we place great reliance in the trial court's judgment when it comes to assessing the legitimacy of the state's explanation. *Antwine*, 743 S.W.2d at 65.

### Ms. Celestine Irving

 The state's primary concern with Ms. Irving was that her husband was a juvenile officer in St. Louis, a position he had held for twelve years. The prosecutor explained that Ms. Irving might. have "inside information, because she's lived with her spouse, regarding juveniles and possibly [be] sympathetic to them because of a broken home, which I imagine the defense intends to bring into this case." The prosecutor further noted that Ms. Irving wore a button that said "kids are special" and that it was possible that Ms. Irving's husband had actually come into contact with the defendant. (Morrow lived in St. Louis his entire life and had been convicted of crimes as a juvenile.)

The experience of Ms. Irving's husband as a juvenile officer was a proper factor upon which the prosecutor could base a "hunch" that she might be overly sympathetic to Morrow. *See State v. Harris*, 842 S.W.2d 953,

954–55 (Mo.App.1992). As to both Ms. Gordon and Ms. Irving, we note that Morrow failed to present any evidence of similarly situated non-blacks who were not struck. Although not determinative, this factor is relevant in determining whether the state's reasons for striking both Irving and Gordon were pretextual. *See Smith*, 944 S.W.2d at 913.

The trial court did not clearly err in overruling Morrow's *Batson* challenges regarding Ms. Gordon or Ms. Irving. Point denied.

### Penalty Phase

### XI. Evidence Regarding Roamel Abercrombie

#### *Testimony of Ms. Abercrombie*

 Morrow contends that the trial court abused its discretion when it allowed Roamel Abercrombie's mother to testify to the circumstances surrounding her son's murder. Ms. Abercromibie testified that just prior to the murder she gave her son a dollar so that he could walk to the store to buy some orange juice. She also testified that after her son was shot she was at his side almost immediately and that he did not have either a gun or drugs on him. She insisted that her son never sold or used drugs.

The court permitted the testimony of Ms. Abercrombie to rebut Morrow's characterization of Abercrombie's murder as a drug deal "gone sour." The court, however, expressly prohibited the state from using Ms. Abercrombie as a victim impact witness. Nonetheless, Morrow argues that her testimony was impermissible victim impact testimony.

 "The trial court has discretion during the penalty phase of trial to admit whatever evidence it deems helpful to the jury in assessing punishment, including evidence regarding the character of the defendant. The importance of the death penalty decision entitles the sentencer to any evidence that may assist it in making that decision." *State v. Kreutzer*, 928 S.W.2d 854, 874 (Mo. banc 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 752, 136 L.Ed.2d 689 (1997) (citations omitted). There is no question that the Aber-

crombie murder was evidence of Morrow's character. The fact that Morrow slandered Abrercrombie by saying that he murdered him while in the middle of a drug deal was also evidence of Morrow's character. It is within the trial court's discretion to determine that evidence of the circumstances surrounding the murder could have been "helpful to the jury in assessing punishment." *Id.* at 874.

Ms. Abercrombie did not testify as a victim impact witness. Her testimony focused solely on what happened the day of the murder and whether her son was a drug dealer. She did not testify as to the impact her son's death has had on her life, nor did she testify to the character of her son, other than to say he did not deal drugs. The trial court did not abuse its discretion in allowing this testimony. Point denied.

### Admissibility of Photograph

■ Morrow also contends the trial court abused its discretion by admitting a photograph of Roamel Abercrombie. Though Abercrombie was 18 when he died, the picture shows him at age 15. Morrow insists that the photo was irrelevant and that it was impermissible victim impact evidence. In addition, Morrow argues that "the prejudice was exacerbated by the prosecutor's frequent ... references to Abercrombie as a little boy."

■ The trial court is vested with broad discretion in the admission of photographic evidence. *State v. LaRette*, 648 S.W.2d 96, 105 (Mo. banc 1983), *cert. denied*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). A photograph is generally admissible to provide the identity of the victim. *State v. Davis*, 653 S.W.2d 167, 175 (Mo. banc 1983). While Roamel Abercrombie was not the victim of the charged murder in this case, the circumstances surrounding the Abercrombie murder were proper evidence of Morrow's character. The trial court did not abuse its discretion by allowing the photo strictly for the purpose of identifying Abercrombie. Further, the discrepancy in the age of Abercrombie between the time of the photograph and the time of the murder was not so great

as to render the trial court's decision an abuse of discretion. Point denied.

■ Morrow also argues that the state's references to Roamel as a "little boy" were prejudicial. Morrow contends that Abercrombie was eighteen years old, six feet tall, and two hundred pounds when he murdered him. This objection is unpreserved as Morrow failed to raise it in his motion for new trial. Moreover, the jury was aware of Abercrombie's size and age. The doctor who performed the autopsy testified to the jury about the precise height and weight of Abercrombie, while his mother told the jury that he was 18 when he died. Because we find no manifest injustice or miscarriage of justice, we do not review for plain error. *See* Rule 30.20.

### XII. Victim Impact Testimony

Morrow argues Missouri's victim impact statute, sec. 565.030.4, RSMo 1994, is unconstitutional on its face. We upheld the constitutionality of this statute and rejected a claim that it was overbroad in *State v. Roberts*, 948 S.W.2d 577, 604 (Mo. banc 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 711, 139 L.Ed.2d 652 (1998). Point denied.

■ Morrow also argues that the victim impact testimony of John Koprowski's wife, Pamela Koprowski, was rhetorical, emotionally inflammatory and, therefore, inadmissible. Morrow complains specifically of the following testimony:

> You know the bullet that murdered John murdered me, too. It murdered his mother, it murdered part of his sisters and brothers, it murdered part of his children. The bullet flies far.

> And you don't recover. It's like something that just goes into your body and rips the very essence of that you and your spouse was, and just tears it right out of your body. It's your soul and your spirit; it's gone and you're empty, you're absolutely empty. You've died, too. You've absolutely died, too.

Morrow failed to raise this objection at trial. Because we find no manifest injustice or miscarriage of justice, we do not review for plain error. *See* Rule 30.20. Point denied.

### XIII. Admissibility of Presentence Report

 Morrow challenges the trial court's admission into evidence of a presentence report. The state read portions of this report during its cross examination of Dr. Cuneo, a defense witness who testified about Morrow's drug dependency. The document contained reports from Morrow's probation and parole officers indicating that he has been unable to conform to the law since the age of thirteen.

Morrow argues that this report was inadmissible because: the report was hearsay, the state failed to show that Dr. Cuneo had seen or relied upon it, it constituted incompetent opinion evidence, and the state failed to give notice of the report. Although he now raises this panoply of challenges to the report, the only objection Morrow raised at trial regarded the state's alleged failure to lay a foundation showing that Dr. Cuneo had seen or relied upon the report.

The following questioning transpired, between Dr. Cuneo and the prosecutor, after the trial court told the state to lay a foundation showing that Dr. Cuneo had seen the presentence report.

Q: You indicated you had received some records from the Public Defender's Office; is that correct?

A: Correct.

Q: And there were some records that you indicated you got from the prison; is that correct also?

A: Correct.

Q: But those particular records you did not base any opinion on; is that correct? Or formulate your diagnosis from those prison records; is that correct?

A: I told you at that time the diagnosis of drug abuse had nothing to do with those records. I also told you I reviewed those records because if—in fact I wanted to know if he was in any type of psychiatric facility.

Q: Now, this Missouri Department of— Board of Probation and Parole report, that was contained within those records that you received [but] didn't make your decision on or base your opinion; is that correct?

A: Correct.

Q: The only time he's been able to remain trouble free since he was thirteen is when he has been confined. You read that when you reviewed the reports?

A: Correct.

Q: Wasn't that important in your determination whether or not cocaine had any affect on his ability to commit the crimes that he did in April of 1994? Wasn't that important that since he hasn't been able to conform his conduct to the law in the State of Missouri?

A: Very much so. Would you like to know why?

Q: And, Doctor, wasn't it also important—you took your history from the defendant; isn't that correct?

A: Not entirely.

Q: Okay. But part of it was from the defendant himself, is that right?

A: Right. And I checked out the facts with the mom, and then later cross-referenced them with school records, and then later cross-referenced them with the Department of Correction records. That's why I review records, to cross-reference.

The record demonstrates that Dr. Cuneo not only had seen the report, but relied upon it for certain factual information. The trial court did not err in overruling Morrow's foundation objections. As to any unpreserved arguments of error, we find no manifest injustice or miscarriage of justice, so we do not review for plain error. *See* Rule 30.20. Point denied.

### XIV. Statutory Aggravating Circumstances

 Morrow challenges the trial court's submission of the five statutory aggravators arguing that they were duplicative in that four of the five aggravators involved the robbery of Koprowski. Morrow complains that "when one aggravator has been multiplied into four, it was probably given undue weight." We rejected this argument in *State v. Clemons*, 946 S.W.2d 206, 232 (Mo. banc

1997), *cert. denied,* 118 S.Ct. 416, 139 L.Ed.2d 318 (1997). Point denied.

■ Morrow raises several additional challenges to the court's finding of four statutory aggravating circumstances. However, we need only find that one statutory aggravating factor exists to affirm a sentence of death.[9] *Smith,* 944 S.W.2d at 921; *State v. Weaver,* 912 S.W.2d 499, 522 (Mo. banc 1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 153, 136 L.Ed.2d 98 (1996); *State v. Sloan,* 756 S.W.2d 503, 509 (Mo. banc 1988), *cert. denied,* 489 U.S. 1040, 109 S.Ct. 1174, 103 L.Ed.2d 236 (1989). We review the trial court's findings to determine if the evidence supports—beyond a reasonable doubt—the existence of an aggravating circumstance. *State v. Brown,* 902 S.W.2d 278, 294 (Mo. banc 1995). We have looked at the record and find overwhelming and uncontested evidence showing that, beyond a reasonable doubt, Morrow was engaged in the perpetration of a robbery when he murdered John Koprowski. *See* Section 565.035.3(2). Therefore, we need not address additional issues raised by Morrow regarding the other statutory aggravating circumstances. *See Weaver,* 912 S.W.2d at 522.

## XV. Constitutionality of Statutory Scheme

Morrow also challenges the constitutionality of Missouri's death penalty statute. Morrow specifically alleges that the scheme is unconstitutional because it prevents consideration of relevant mitigating evidence. We rejected this argument in *State v. Ramsey,* 864 S.W.2d 320, 337 (Mo. banc 1993), *cert. denied,* 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994). Point denied.

## XVI. Penalty Phase Closing Arguments

■ Morrow asserts the trial court erred by overruling his objections to various remarks made in the state's penalty phase closing argument. We note that the "parties have wide latitude in arguing during the death penalty phase of a first degree murder case." *State v. Richardson,* 923 S.W.2d 301,

322 (Mo. banc 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 403, 136 L.Ed.2d 317 (1996). We first address those objections properly preserved.

### Preserved Objections

■ Morrow argues that the trial court erred by overruling his objection that there was no evidence to support the prosecutor's statement that John Koprowski's mother loved him. This argument is without merit. It is reasonable to infer that a mother loves her son. Moreover, Koprowski's wife testified as to the terrible impact that Koprowski's death had on his mother. The trial court did not abuse its discretion. Point denied.

■ Morrow's next argument centers around the following remarks:

When he does his next murder, Mr. Koprowski, this is when he really gets scared because he knows there's no such thing as a free murder, ladies and gentlemen. And sentencing him to life without parole for the death of this man completely ignores this man's death.

Defense: *Objection, improper argument.*

Morrow contends that this argument was impermissible because the jury had no authority over sentencing in the Abercrombie case. We find, instead, that "the prosecutor was merely expressing his opinion fairly drawn from the evidence before the jury that the death penalty was appropriate." *State v. Mease,* 842 S.W.2d 98, 109 (Mo. banc 1992), *cert. denied,* 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993). The evidence was undisputed that Morrow murdered Abercrombie. It was proper for the prosecutor to develop a theory as to why this fact made the death penalty appropriate in this case. The trial court did not abuse its discretion. Point denied.

■ Morrow also objects to the state commenting "that justice demands the death penalty *in this particular case,* to do anything else cheapens the value of human life."

9. We also address whether there was sufficient evidence to support all four statutory aggravators, pursuant to Section 565.035.3(2) RSMo 1994, at point XVIII., infra. Here, however, we address only those issues raised by Morrow.

Morrow alleges that this argument violates *State v. Storey*, 901 S.W.2d 886, 902 (Mo. banc 1995). However, the argument in *Storey* was different. It misstated the law and potentially misled the jury into believing that the only inquiry required was whether the value of the victim's life exceeded the value of the defendant's life and erroneously grouped all persons guilty of murder into one category. The argument here did not misstate the law. *See State v. Kenley*, 952 S.W.2d 250, 270 (Mo.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 892, 139 L.Ed.2d 878 (1998). Nor did it group all persons guilty of murder into one category. Instead, it focused on the facts of this case warranting the death penalty and argued that justice demanded the death penalty in this case based on these facts. *See Mease*, 842 S.W.2d at 109.

The trial court did not abuse its discretion. Point denied.

### Unpreserved Objections

■ We are hesitant to exercise our plain error review of closing arguments. "Appellate review of assertions of plain error in a prosecution's closing argument pressures trial courts into the situation of 'uninvited interference with summation and a corresponding increase in the risk of error by such intervention.'" *State v. Wise*, 879 S.W.2d 494, 516 (Mo. banc 1994), *cert. denied,* 513 U.S. 1093, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995) (*quoting State v. Clemmons*, 753 S.W.2d 901, 907–08 (Mo. banc 1988), *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988)).

■ Morrow complains of the following remarks:

But you have to keep in mind, because you heard evidence today, ladies and gentlemen, that he had just gotten out of jail January of '94, this is April of '94.

And look at his history, ladies and gentlemen. You can take those back to the jury room to look at them. What do you think is going through his mind? He knows where he's going to go if he gets caught because he's been there, he's been there and done that.

Keep that in mind, ladies and gentlemen. That's also a statutory aggravating circumstance you can consider in this case, that he knew that he couldn't get caught—

Defense: *Objection, misstates the law,* that's not—

Court: Overruled.

Morrow now contends that these statements were not supported by the evidence. However, this objection was not preserved, as it was never raised at trial.

Morrow also complains that the prosecutor told the jury to read the presentence investigation report and "find out what kind of guy [Morrow] really is." Morrow argues that the report was impermissible hearsay. Morrow, however, did not make a hearsay objection at trial.

Morrow also challenges the following remarks:

Now, I don't know what else you need to make this decision. It's a tough decision but society has to make tough decisions, presidents have to make tough decisions, legislators have to make tough decisions; everybody has to make tough decisions and you're going to have to make it for our community, ladies and gentlemen. Like I indicated to you-

Defense: *Objection, improper evidence.*

Court: Overruled.

■ Morrow contends that these remarks are inflammatory and unsupported by the evidence. These objections are not preserved for review because Morrow's objection of "improper evidence" is not specific enough to raise them. Objections must be specific to be preserved for appellate review. *State v. Driver*, 912 S.W.2d 52, 54 (Mo. banc 1995).

Because we find no manifest injustice or miscarriage of justice arising from the state's closing arguments, we do not review for plain error. *See* Rule 30.20. Point denied.

### XVII. Proportionality Review

Section 565.035 requires us to independently review the sentence of death to determine: whether it was imposed under the influence of passion or prejudice, or any oth-

er arbitrary factor; whether there was sufficient evidence to support the finding of the aggravating circumstances; and whether the sentence was excessive or disproportionate to the penalty imposed in similar cases.

There is no evidence that the judge imposed the sentence of death under the influence of passion, prejudice, or any other arbitrary factor.

We have already found overwhelming evidence to support a finding that Morrow murdered Koprowski during the commission of a robbery.[10] We have reviewed the record and also find sufficient evidence to support all four statutory aggravating circumstances found by the trial court.

The evidence, beyond a reasonable doubt, shows: that Morrow was previously convicted of the class C felony of assault in the second degree; that Morrow killed Koprowski so that he could steal his new jeep; and, that Morrow approached John Koprowski, a complete stranger to Morrow and his accomplice, and murdered him to steal his jeep and obtain funds to support his drug habit. *See* section 565.032.2(1); section 565.032(4); section 565.032(7), RSMo 1994.

In determining whether the sentence of death is excessive or disproportionate, we are to consider "the crime, the strength of the evidence and the defendant." *See* section 565.035.3(3), RSMo 1994.

We have found a sentence of death appropriate when the crime to be considered is a murder committed during the course of a robbery. *See State v. Ramsey*, 864 S.W.2d 320 (Mo. banc 1993); *State v. Kilgore*, 771 S.W.2d 57 (Mo. banc 1989), *cert. denied*, 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989); *State v. Wise*, 879 S.W.2d 494 (Mo. banc 1994), *cert. denied*, 513 U.S. 1093, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995); *State v. Skillicorn*, 944 S.W.2d 877 (Mo. banc 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 568, 139 L.Ed.2d 407 (1997). Morrow, however, asserts that Koprowski's resistance distinguishes his crime from other death penalty cases where a robbery ended in murder.

When Morrow shot Mr. Koprowski, there was no resistance. Instead, Koprowski was on the ground with Morrow standing above him, yelling "get up you son of a bitch." Koprowski did not get up, however, until after Morrow shot him in the face and was driving away in Mr. Koprowski's car. The fact that Morrow became irritated with his victim for having initially resisted does not distinguish the culpability of his actions from other murders committed during the course of a robbery.

Moreover, any small mitigating effect Morrow might enjoy from Koprowski's initial resistance is overshadowed by our consideration of "the defendant." Morrow has admitted to killing an eighteen year old just hours before he shot Koprowski. Further, Morrow showed no signs of remorse after the murder. Instead, Morrow used the fruits of his murder, Koprowski's jeep, to continue his crime spree. Shortly after leaving Koporowski staggering in the parking lot, Morrow robbed Sandra Merriman. *See State v. Kenley*, 952 S.W.2d 250, 270 (Mo. banc 1997).

Finally, the evidence against Morrow is overwhelming and uncontested, as Morrow confessed to murdering Koprowski.

Morrow's sentence is neither excessive nor disproportionate.

## XVIII.

The judgment is affirmed.

All concur.

---

10. *See* supra, point XIV.