STATE of Missouri, Respondent,

v.

Vincent McFADDEN, Appellant.

No. SC 86857.

Supreme Court of Missouri,
En Banc.

May 16, 2006.

Rehearing Denied June 13, 2006.

Rosemary E. Percival, Office of Public Defender, Kansas City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Shaun J. Mackelprang, Asst. Atty. Gen., Jefferson City, for Respondent.

RONNIE L. WHITE, Judge.

## I.

A jury convicted Vincent McFadden (McFadden) of first-degree murder and armed criminal action. McFadden was given the death penalty consistent with the jury's recommendation. This Court has jurisdiction pursuant to Mo. Const. art. V, sec. 3. Among his nine points of error, McFadden raises a valid *Batson* challenge. The judgment is reversed and the case is remanded.

## II.

The facts, which this Court reviews in the light most favorable to the verdict,[1] indicate that on July 3, 2002, McFadden and Michael Douglas encountered Todd Franklin. An altercation ensued, during which Douglas and McFadden each shot Franklin who died at the scene. McFadden was charged with the first-degree murder and armed criminal action.

At trial, the State exercised five of its nine peremptory challenges to remove African–American venirepersons, leaving only one African–American to serve on the jury. The defense counsel challenged the strikes under *Batson v. Kentucky*.[2] After the State offered explanations, defense counsel argued that these reasons were merely pretextural. The trial court denied McFadden's *Batson* claim. The jury found McFadden guilty of both charges. During the penalty phase, the jury found five statutory aggravators and recommended a sentence of death. On April 22, 2005, the court sentenced McFadden to

---

1. *State v. Taylor*, 134 S.W.3d 21, 24 (Mo. banc 2004).

2. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). "It is well known that prejudices often exist against particular classes in the community, which sway the judgment of jurors, and which, therefore, operate in some cases to deny to person of those classes the full enjoyment of that protection which others enjoy." *Miller–El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 2323, 162 L.Ed.2d 196 (2005) (quoting *Strauder v. West Virginia*, 100 U.S. 303, 309, 25 L.Ed. 664 (1880)). Racial discrimination in jury selection compromises the defendant's right to a trial by an impartial jury, *Miller–El*, 125 S.Ct. at 2323 (citing *Strauder*, 100 U.S. at 308, 10 Otto 303), and essentially creates "state-sponsored group stereotypes rooted in, and reflective of, historical prejudice." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). This discriminatory practice "invites cynicism respecting the jury's neutrality," *Powers v. Ohio*, 499 U.S. 400, 412, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), undermines public confidence, *Georgia v. McCollum*, 505 U.S. 42, 49, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), and jeopardizes the integrity of the judicial system. *Miller–El*, 125 S.Ct. at 2324.

death and to a term of life imprisonment. This appeal followed.

## III.

■ McFadden's *Batson* challenge is dispositive. It has been long recognized that racial discrimination in jury selection violates the Equal Protection Clause.[3] In *Batson v. Kentucky*, the United States Supreme Court held that a defendant could make out a prima facie case of discriminatory jury selection by "the totality of the relevant facts" of the prosecutor's behavior during the defendant's trial.[4]

■ In *State v. Parker*, this Court set forth the procedure to be followed when a defendant makes a *Batson* challenge.[5] First, a defendant must challenge one or more specific venirepersons struck by the State and identify the cognizable racial group to which they belong.[6] Second, the State must provide a race-neutral reason that is more than an unsubstantiated denial of discriminatory purpose.[7] Third, the defense must show that the State's explanation was pretextual and the true reason for the strike was racial.[8]

■ To show pretext, the defense can present "side-by-side comparisons" of venirepersons allegedly struck for racially discriminatory reasons with those who were allowed to serve.[9] Evidence of purposeful discrimination is established when the stated reason for striking an African–American venireperson applies to an otherwise-similar member of another race who is permitted to serve.[10] In evaluating a *Batson* challenge, the trial court's "chief consideration should be the plausibility of the prosecutor's explanations in light of the totality of the facts and circumstances surrounding the case."[11]

■ The trial court's findings with regard to a *Batson* challenge will be set aside if they are clearly erroneous.[12] A finding is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been made.[13] In light of the totality of the following facts and circumstances, this Court is left with the definite and firm conviction that the trial court was mistaken in this case:

### *Venireperson C.W.*

■ It appears that African–American venireperson C.W. would have been a strong juror for the State. Her father had been shot to death and she had a working relationship with law enforcement. De-

---

**3.** *Strauder*, 100 U.S. at 308, 10 Otto 303; *Miller–El*, 125 S.Ct. at 2324; *State v. Edwards*, 116 S.W.3d 511, 524 (Mo. banc 2003); *State v. Brown*, 958 S.W.2d 553, 553 (Mo. banc 1997); *State v. Parker*, 836 S.W.2d 930, 933 (Mo. banc 1992).

**4.** *Batson*, 476 U.S. at 94, 106 S.Ct. 1712. See also *Miller–El*, 125 S.Ct. at 2324; *Parker*, 836 S.W.2d at 933; *State v. Antwine*, 743 S.W.2d 51, 64 (Mo. banc 1987).

**5.** *Parker*, 836 S.W.2d at 939.

**6.** *Id.*

**7.** *Id.*

**8.** *Id.*

**9.** *Miller–El*, 125 S.Ct. at 2325. See also *Edwards*, 116 S.W.3d at 525; *Antwine*, 743 S.W.2d at 65.

**10.** *Miller–El*, 125 S.Ct. at 2325; *Edwards*, 116 S.W.3d at 525; *Antwine*, 743 S.W.2d at 65.

**11.** *Parker*, 836 S.W.2d at 939. See also *Miller–El*, 125 S.Ct. at 2331; *Edwards*, 116 S.W.3d at 527; *Antwine*, 743 S.W.2d at 64.

**12.** *Edwards*, 116 S.W.3d at 525; *Antwine*, 743 S.W.2d at 66.

**13.** *Edwards*, 116 S.W.3d at 525; *Antwine*, 743 S.W.2d at 66.

spite these facts, the State claims it struck C.W. for two reasons: (1) her telephone rang and (2) it would have been difficult for her to be absent from work.

First, the State contends it struck C.W. because her telephone rang. The prosecutor claimed that C.W. did not take the process seriously because she was fiddling with her telephone and distracting other members of the panel. Defense counsel countered that it appeared C.W. was fumbling because she was having difficulty turning her telephone off, but eventually succeeded.

It does not appear that there was a white juror who had trouble with her telephone, but such an identical comparison is not necessary. "A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters."[14]

Even though the State made no record of C.W.'s telephone ringing at the time and failed to ask the court to instruct venirepersons to turn off their telephones, the State was apparently so bothered that it used the strike on C.W. and allowed white venireperson J.B. to remain on the jury. During *voir dire*, J.B. repeatedly stated that he would want the State to prove guilt beyond any possible doubt before he could impose a death sentence. The State unsuccessfully moved to strike J.B. for cause, arguing that it "was quite clear he would require a higher burden for guilt before he would consider the death penalty." Yet, rather than striking a white venireperson who required a higher burden of proof, the State struck an African–American because her telephone rang.

Second, the State asserts that it struck C.W. because it would have been difficult

for her to be absent from work. During *voir dire,* C.W. stated:

> I'm a manager for a cleaning company and in our group there is three area managers. One is out of town—I mean one is sick, brain concussion and the other one has his own area, and I don't know if my boss will allow me to be out because I have to handle all buildings in the evening. Make sure all the cleaners are at work on time and any problems that come up.

The State failed to strike white juror S.R. who also expressed that she would have difficulty taking time away from work. S.R. worked for a company that was about to undergo an audit. She was "one of the key people" and her employer had written a letter for her to give to the court explaining the extent of the hardship. She worked in the "back office" and needed "to account for all the transition. The cash coming in and out and stuff." A lot of work was needed to prepare for the audit.

Not only was S.R.'s statement of hardship more definite than C.W.'s claim, but S.R. had an additional reason to be struck. S.R. expressed a familiarity with the scene of the murder. The State indicated that there had been extensive construction in the area since the time of the murder and had concerns that jurors familiar with the scene would not rely exclusively on witness' accounts of the scene as it existed at the time of the murder. This familiarity with the area of the crime served as the rationale for striking African–American venirepersons C.N., M.B., V.G., and W.S. Yet, in addition to S.R., there were four additional white jurors with familiarity with the area of the crime who were not

14. *Miller–El,* 125 S.Ct. at 2329, n. 6.

struck.[15]

### *Venireperson C.N.*

■ The State contends African–American venireperson C.N. was struck for four reasons: (1) she was an employee of the St. Louis City School District and would likely be liberal, (2) she lived in a high crime area but never heard gunshots, (3) jury service would create a hardship, and (4) she was familiar with the area of the crime. Each of these reasons either equally applied to white jurors who were not struck by the State or had no relevance to the case.

First, the prosecutor claimed he struck C.N. because she was an employee of the St. Louis School District. However, in *State v. Edwards,* this Court rejected the notion that a juror's employment as a postal worker was sufficient reason to justify a peremptory strike.[16] This Court held that, "[i]f the mere incantation of the phrase 'he is a postal worker' were sufficient to overcome any showing of pretext, the third step of the *Batson* test would be illusory."[17] In that case, the following guidance was offered:

> In the future, trial courts should similarly consider strikes based on occupation carefully, assessing them for pretext by looking at whether the occupation and the claimed traits relate to the particular case or juror, whether similarly situated jurors are treated differently, and so forth, considering the factors set out above, and not allow a strike to rest

solely on the claim that the juror is "a postal worker."[18]

The Court held that the trial court had not clearly erred in allowing the strike, because the prosecutor described his prior negative experiences with postal workers as jurors, gave specific reasons why they would not be good jurors, and struck two other jurors who had similar occupations to the challenged postal worker.[19]

Here, the prosecutor failed to explain the basis for his opinion, or describe what his prior experiences entailed, or give specific reasons for why an employee of the St. Louis school system would be unfavorable for the State. Without more, C.N.'s employment with the school district is pretextual.

■ Second, the prosecutor argued that he struck C.N. because she lived in a high crime area and had never heard gunshots. This appears to be loosely related to the case because witnesses living in high crime areas would be testifying that they heard a gunshot. However, C.N.'s recognition of a gunshot is irrelevant. Not only was the witnesses' recognition of a gunshot was not in dispute, but even if it were in dispute, it is unclear why a juror's lack of experience in hearing a gunshot is relevant. Additionally, had this issue been relevant, the State would have asked all venirepersons if they could recognize the sound of a gunshot. "[T]he State's failure to engage in any meaningful *voir dire* ex-

---

**15.** The following five white jurors said they were familiar with the area of the crime and were not struck by the State: S.R. (whose aunt and uncle had lived in the area); J.S. (whose father and grandparents had lived in the area), L.S. (who had worked in the area), R.K. (who had done electric utility work in the area), and E.D. (had lived in a nearby community for 30 years and often had shopped in the area).

**16.** *Edwards,* 116 S.W.3d at 525–28.

**17.** *Id.* at 526. See also *Edwards,* 116 S.W.3d at 550 (Teitelman, J., concurring) ("in the vast majority of cases, a prospective juror's employment has nothing to do with his or her ability to fairly weigh the evidence and arrive at a just decision").

**18.** *Edwards,* 116 S.W.3d at 528.

**19.** *Id.*

amination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." [20]

Finally, the prosecutor asserts he struck C.N. because of hardship and her familiarity with the area of the crime. C.N. suggested it would be difficult for her to serve because it would be hard for her employer to replace her for a week and she was a full-time evening student approaching the end of the term. The State also claimed to have struck C.N. because of her familiarity with the area of the crime. However, as noted above, white juror S.R. also expressed hardship and, along with four other white jurors who were not struck, had a familiarity with the area of the crime.

### Venireperson M.B.

■ Like C.W., it appears that African–American venireperson M.B. would have been a strong juror for the State. She expressed confidence in the ability of fingerprint evidence to show guilt. Since the defendant had given notice of an alibi defense, M.B.'s belief in the accuracy of fingerprint evidence would have served the State well. Also, like C.W., M.B. had a family member who had been shot to death.

However, despite these facts, the State struck M.B. citing the following four reasons: (1) she had problems with the concept of acting in concert, (2) she was familiar with the area of the crime, (3) she knew a relative of a potential witness, and (4) she had an unrealistic view of scientific evidence.

First, the State argues that it struck M.B. because she had problems with the concept of acting in concert. However, there is no support for this position. Although other venirepersons had expressed difficulty with the concept, M.B. never did.

Second, the State claims that M.B. was familiar with the area of the crime. However, as noted above, five white venirepersons also possessed familiarity with the area of the crime and were not struck from the jury.

Third, the State asserts that it struck M.B. because she knew a relative of a potential witness. M.B. indicated that her niece had dated someone with the same last name as one of the witnesses, but that she did not know any family members of the man her niece had dated. The prosecutor stated that he removed M.B. because she knew the witness's family and her "close involvement" with the family could be a problem. However, M.B. did not know the witness and was not even asked how well she knew the man her niece had dated. Additionally, because this loose connection was to a witness for the State, any bias would arguably be in favor of the State.

Finally, the State contends that it struck M.B. because she had an unrealistic view of scientific evidence. M.B. had indicated that she was a medical laboratory technologist who worked full time for the crime laboratory in St. Louis County. She indicated that she did not personally do any testing and she did not have contact with people who did. She stated, "If you are going to [commit a crime], you are going to get caught with the technology that they have today." While M.B.'s confidence in forensic evidence may be high, such a belief would only strengthen the credibility of the State's fingerprint evidence linking McFadden to the crime.

In addition, the State failed to strike white juror L.S. who also had exposure to police laboratory work. L.S.'s boss worked with the Missouri State Highway

20. *Miller-El,* 125 S.Ct. at 2328 (quoting *Ex parte Travis,* 776 So.2d 874, 881 (Ala.2000)).

Patrol to create standards for laboratory testing and prepare training aids for drug sniffing dogs. L.S. would meet with police officers for the dogs to test the products. He had discussed with police officers "interesting kind of gruesome stories in the federal lab but not police work in general." Because of M.B.'s certainty that fingerprint evidence would determine guilt, she was a stronger juror for the State than L.S.

### Venireperson V.G.

■ The State gave six reasons for striking African–American venireperson V.G.: (1) she was elderly, opinionated, and hard-headed, (2) she denied that she lived in a high-crime area, (3) she had an ulcer on her leg, (4) she may have read about the case, (5) she was familiar with the area of the crime, and (6) her sister lived in the area of the crime and was the victim of arson. Each of these reasons either equally applied to white jurors who were not struck by the State.

■ First, the State alleged it struck V.G. because "[s]he's elderly, very opinionated, corrected both myself and defense counsel about questions.... She seems very hard-headed and opinionated and may not be good in discussing and considering views of other jurors." However, as Judge Teitelman recognized, strikes based on vague references to attributes like demeanor "are largely irrelevant to one's ability to serve as a juror and expose venirepersons to peremptory strikes for no real reason except for their race." [21] Accordingly, such vague references are heavily scrutinized.

Second, the State offered that V.G. "lives in a high crime area but denied that it is high crime." V.G. stated that she lived in an area that the City of St. Louis considered a high crime area. She did not consider it a high crime area even though she was robbed there once. However, this Court must consider whether the explanation provided by the State was related to the case to be tried, clear and reasonably specific, and legitimate. [22] Here, it is unclear that V.G.'s assessment of her own neighborhood has any bearing whatsoever on the case at hand.

Third, the prosecutor allegedly struck V.G. because she had a problem with her leg, and he did not want to run out of jurors because of an infirmity. While V.G. had an ulcer on her leg and she had planned to see the doctor the following week, she also indicated that it was doing better and healing. In addition, the State failed to strike white juror C.S. for his infirmity. C.S. was questioned at length regarding his problem with anxiety attacks. C.S. informed the court that he has taken medication to fight anxiety attacks for fifteen years, and he did not know how he would handle sequestration. If he felt a panic attack coming on, he could take extra medication, but it would not help right away and he would be unable to listen to the evidence. If the State was truly afraid of losing a jury due to infirmity, C.S. appears to have been a stronger candidate for the use of the State's peremptory strike.

Fourth, the State expressed concern that V.G. had read about the case, yet failed to strike a similarly situated white juror. V.G. indicated that she might have read about the case in the newspaper, because she reads the paper daily. However, V.G. indicated that if she had read about the case, she did not remember any

---

21. Edwards, 116 S.W.3d at 550 (Teitelman, J., concurring).

22. Miller–El, 125 S.Ct. at 2324; Edwards, 116 S.W.3d at 527; Parker, 836 S.W.2d at 934; Antwine, 743 S.W.2d at 64.

of the details. She indicated that if she recalled something during the course of the trial, she knew she could set it aside, and nothing she read would keep her from being fair and impartial. Although white juror R.K. could not recall details, he was more certain that he had read about the case in the newspaper.

Fifth, the State removed V.G. due to her familiarity with the area of the crime. As previously examined, this reason equally applied to five white jurors who were not struck by the State.

Finally, the State commented that V.G.'s sister resided in the area of the crime and was an arson victim. However, the State alleged in this case that McFadden had terrorized the area and if the jurors cared about the people in the area, they would find McFadden guilty. Logically, a juror with a personal connection to a crime victim in the area would only strengthen the credibility of the State's argument.

### Venireperson W.S.

■ The State stated the following four reasons for striking African–American venireperson W.S.: (1) he seemed to be agitated and confused about his role as a juror, (2) although he lived very close to the area of the crime, he stated he was not familiar with it, (3) he did not want to share details about his nephews' work in law enforcement with the rest of the panel, and (4) he appeared to be sleeping during *voir dire*.

First, the State argues that it struck W.S. because he seemed to be agitated and confused about his role as a juror. The State's allegation appears to be based on the following exchange:

VENIREPERSON W.S.: You got aggravation and what do they get, the crime attorney, the defense attorneys, they got an eye witness. How do that work? It's up the jury or who are you going to believe?

MR. BISHOP: Right.

VENIREPERSON W.S.: You said only one eye witness.

MR. BISHOP: I'm sorry.

VENIREPERSON W.S.: What if there is more than one eye witness? You got one, she got one. How do that work?

MR. BISHOP: I guess I'll ask you. If you are selected as a juror, you have to determine the credibility of the witnesses. That's your job. Can you make that decision? If there are witnesses with competing stories, can you make the decision of who is telling the truth and who is lying?

VENIREPERSON W.S.: Yes.

While W.S. may have been initially confused about his role as a juror, this confusion seems to have been alleviated by counsel's explanations. There is no indication that W.S.'s confusion would have impaired his ability to serve as a juror.

Second, the State asserts that it struck W.S. because, although he lived very close to the area of the crime, he stated he was not familiar with it. Although, W.S.'s zip code indicates he lived in Jennings, which is near the area of the crime, the State faults him for not responding that he was familiar with the area. Even if it were established that W.S. was familiar with the area of the crime, the State did not strike five white jurors who responded affirmatively that they were familiar with the area. For example, E.D. stated that she lived in Jennings for over thirty years and frequently shopped in the area of the crime. The State removed W.S. on the mere possibility that he was familiar with the area, yet left E.D. and four other white jurors who definitely were familiar with it.

Third, the State asserts that it struck W.S. because he did not want to share

details about his nephews' work in law enforcement with the rest of the panel. When defense counsel asked the panel if anyone had relatives in law enforcement, W.S. responded that he had three nephews in law enforcement. He then asked to approach the bench where the following exchange occurred:

THE COURT: [W.S.], you had indicated that you had three nephews?

VENIREPERSON W.S.: Three nephews. One is a police officer. One is in Denver, Colorado, and one Washington, D.C., F.B.I. Agent. We don't discuss their affairs. I don't want to get into that.

THE COURT: Is there anything about your nephews being involved in law enforcement that would affect your ability to be a fair juror in this case?

VENIREPERSON W.S.: No, I'm fair and open minded. I am just concerned about their safety.

MS. TURLINGTON: You don't want to disclose their location?

VENIREPERSON W.S.: Yes.

THE COURT: It won't affect your ability to listen to police testimony. You can listen to that fairly and impartially?

VENIREPERSON W.S.: Yes, I can.

While W.S. had high concern for his nephews' safety, his attitude toward law enforcement appears to be generally positive. Such an attitude is usually favorable to the State's position.

 Fourth, the State contends that it struck W.S. because he appeared to be sleeping during *voir dire*, which is usually a valid reason to exercise a peremptory strike.[23] However, the existence of a valid justification will not preclude this Court from recognizing a *Batson* violation when examining the facts of the case in a larger context.[24]

### IV.

The State used its peremptory strikes to remove five of the six qualified African-American venirepersons. In response to the defense's properly-raised *Batson* challenge, the State offered explanations for its strikes—some of which, when examined in isolation, appear to have some validity. However, in light of the totality of the facts and circumstances, it becomes obvious that these explanations were merely pretext for the State's exercise of its peremptory strikes for racially discriminatory reasons. "To excuse such obvious prejudice because the challenged party can also articulate nondiscriminatory reasons for the peremptory strike would erode what little protection *Batson* provides against discrimination in jury selection."[25]

 "However guilty a defendant may be, the law requires that a conviction only be obtained through a fair trial. The right to sit before a jury of one's peers, chosen not because of race, but because of their standing as citizens doing their civic duty, is essential to a fair trial."[26] The trial court's denial of the McFadden's *Batson* challenge was clearly erroneous. Accordingly, the judgment can not be allowed to stand.[27]

**23.** *State v. Hall*, 955 S.W.2d 198, 205–06 (Mo. banc 1997).

**24.** *Miller–El*, 545 U.S. 231, 125 S.Ct. at 2325; *Antwine*, 743 S.W.2d at 65; *State v. Hopkins*, 140 S.W.3d 143, 157 (Mo.App.2004).

**25.** *McCormick v. State*, 803 N.E.2d 1108, 1113 (Ind.2004). See also *Antwine*, 743 S.W.2d at 65.

**26.** *Edwards*, 116 S.W.3d at 551 (Teitelman, J., concurring).

**27.** *Miller–El*, 545 U.S. 231, 125 S.Ct. at 2340. With regard to the dissent, the principal opin-

## V.

Because McFadden's *Batson* claim is dispositive, it is not necessary to address the remaining eight grounds for appeal. The judgment is reversed and the case is remanded for a new trial.

WOLFF, C.J., LAURA DENVIR STITH and TEITELMAN, JJ., concur.

ion does not inappropriately conduct a *de novo* review as the dissent claims when applying the "totality of relevant facts" test, but rather follows *Batson* and *Miller–El* exactly in that McFadden established a "prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson v. Kentucky*, 476 U.S. 79, 93–94, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Miller–El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 2324, 162 L.Ed.2d 196 (2005). Once McFadden established his prima facie case, the principal opinion followed the United States Supreme Court's precedent and performed side-by-side comparisons between the black venire panelists who were struck and white panelists allowed to serve. *Miller–El v. Dretke*, 125 S.Ct. at 2325–2340.

Nor has the Court deviated from its established precedent that when "evaluating a *Batson* challenge," the trial court's chief consideration should be the plausibility of the prosecutor's explanations in light of the totality of the facts and circumstances surrounding the case. *Parker*, 836 S.W.2d at 939. As the United States Supreme Court noted in *Miller–El*, happenstance was unlikely to explain the disparity of the prosecutor's use of its peremptory strikes to exclude 91% of the eligible African–American venire members. *Miller–El v. Dretke*, 125 S.Ct. at 2324. Happenstance also fails the prosecutor in this instance, where 83% of the eligible African–American venire members were stricken using pretextual reasons.

Moreover, Justice Breyer's reluctant concurrence in *Rice v. Collins*, —— U.S. ——, —— –——, 126 S.Ct. 969, 976–977, 163 L.Ed.2d 824 (2006) does not set precedent, nor does it, as the dissent alleges, in any way alter the "totality of the relevant facts" test explained in *Batson* that was applied in *Miller–El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 162

LIMBAUGH, J., dissents in separate opinion filed; PRICE and RUSSELL, JJ., concur in opinion of LIMBAUGH, J.

STEPHEN N. LIMBAUGH, JR., Judge, dissenting.

I respectfully dissent.

I agree with the majority that the decision to strike a venireperson because of that person's race is unacceptable. How-

L.Ed.2d 196 (2005), or the clearly erroneous standard used to review a trial court's ruling in a *Batson* challenge (See *Edwards*, 116 S.W.3d at 525). *Edwards*, 116 S.W.3d at 525. Instead, Justice Breyer opines about the failure of *Batson* to adequately "ferret out unconstitutional discrimination in the selection of jurors," *Id.* at 976, and the passage that follows the paragraph quoted by the dissent addresses the need to ensure those Constitutional protections:

> The upshot is an unresolvable tension between, on the one hand, what Blackstone called an inherently " 'arbitrary and capricious' " peremptory challenge system, *Miller–El*, 545 U.S. 231, supra, at ——, 125 S.Ct. 2317, 2343, 162 L.Ed.2d 196 (BREYER, J., concurring) (quoting 4 W. Blackstone, Commentaries on the Laws of England 346 (1769)), and, on the other hand, the Constitution's nondiscrimination command. Given this constitutional tension, we may have to choose. *Miller–El*, 545 U.S. 231, supra, at ——, 125 S.Ct. 2317, 2343, 162 L.Ed.2d 196 (BREYER, J., concurring); *Swain v. Alabama*, 380 U.S. 202, 244, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) (Goldberg, J., dissenting) ("Were it necessary to make an absolute choice between the right of a defendant to have a jury chosen in conformity with the requirements of the Fourteenth Amendment and the right to challenge peremptorily, the Constitution compels a choice of the former"); *Batson, supra*, at 107, 106 S.Ct. 1712, 90 L.Ed.2d 69 (Marshall, J., concurring) (same).

Faced with this tension, this principal opinion will not waiver in its responsibility to ensure that a jury is chosen in conformity with the Constitution's requirements, and in this case in particular, it will not accept the prosecutor's attempt to mask racially discriminatory peremptory challenges with absurd rationales.

ever, the majority's decision-making process in this case fails because of its selective identification of the applicable law, its misapplication of the law to the facts and, in several instances, its mischaracterization of the facts themselves. All in all, the majority has failed to show that it was clear error for the trial court to accept the state's race-neutral explanations for its strikes.

## I.

Though the majority parrots the appropriate legal standard of review, which is review for clear error, *State v. Edwards*, 116 S.W.3d 511, 525 (Mo. banc 2003), the length to which the majority stretches to satisfy the critical reader that the state's explanations were not race-neutral shows that the majority is actually engaging in *de novo* review so as to reach its preferred outcome. Moreover, the majority fails to give so much as a passing reference to the rule that reviewing courts should defer to the trial court's judgment when it comes to assessing the legitimacy of an explanation for a peremptory strike. *State v. Morrow*, 968 S.W.2d 100, 114 (Mo. banc 1998). The nature of peremptory strikes is necessarily subjective, and where the evidence before a court is amenable to two competing views, the fact-finder's choice between them cannot be clearly erroneous. *Id.* Thus, even if this Court would have decided a close case differently, if the trial court's decision was plausible, that decision must stand. *Easley v. Cromartie*, 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001).

In much the same way, the majority misapplies the "totality of the relevant facts" test explained in *Batson* and recently applied in *Miller–El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). In *Miller–El* the Supreme Court applied the test in the context of address-

ing institutional and procedural defects that established the existence of an overarching discriminatory purpose. Specifically, the Supreme Court found evidence of jury shuffling, disparate questioning that amounted to trickery, *and a formal written manual on the topic of how to exclude minorities from jury service. Miller–El,* 545 U.S. 231, 125 S.Ct. at 2333–39. The Supreme Court was not (as the majority appears to do here) using the totality of the relevant facts to apply a *de novo* standard of review to the trial court's determinations as to individual venirepersons. If there were any doubt, just three months ago, in a follow-up case to *Miller–El,* Justice Breyer clarified the "present legal framework" as follows:

> The trial judge is best placed to consider the factors that underlie credibility: demeanor, context, and atmosphere. And the trial judge is best placed to determine whether, in a borderline case, a prosecutor's hesitation or contradiction reflect (a) deception, or (b) the difficulty of providing a rational reason for an instinctive decision. Appellate judges cannot on the basis of a cold record easily second-guess a trial judge's decision about likely motivation. These circumstances mean that appellate courts will, and must, grant the trial courts considerable leeway in applying *Batson.*

*Rice v. Collins*, — U.S. —, 126 S.Ct. 969, 977, 163 L.Ed.2d 824 (2006) (Breyer, J., concurring).

In *Rice*, the Supreme Court also reconfirmed the rules that prosecutors must abide by when making their peremptory strikes and in defending them after a *Batson* challenge. "Although the prosecutor must present a comprehensible reason [for making the strike] ... this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it

suffices." *Id.* at 973–74. And even if the prosecutor's perception of the venireperson is based merely on a race-neutral hunch, or on race-neutral "horse sense," the strike may be made. *State v. Morrow*, 968 S.W.2d 100, 114 (Mo. banc 1998). Unfortunately, these principles too, are omitted from the majority's analysis.

Yet another failing is the majority's methodology in comparing each stricken venireperson to non-stricken venirepersons to determine whether non-stricken venirepersons were similarly situated to those stricken. It is quite evident that, in each case, the majority cherry picked individual characteristics from a number of non-stricken venirepersons (who were otherwise completely different) and then concluded that the sum of those characteristics is the equivalent of a single similarly situated venireperson. This amalgamation of venirepersons to create a sort of super-venireperson that can then be used for comparison is completely incongruous with the analysis it purports to employ. While several of the non-stricken venirepersons shared individual characteristics with the stricken venirepersons—as any human being would!—the majority's methodology does not show that stricken and non-stricken venirepersons were "similarly situated" in a way that gives that term real meaning.

Finally, the majority inexplicably fails to acknowledge that *McFadden did not challenge the state's reasons for striking two of the venirepersons, C.N. and V.G.* As this Court has made clear, "the right of criminal defendants to challenge racially motivated strikes by the prosecutor" is "predicated . . . upon the defendant's timely objection." *State v. Parker*, 836 S.W.2d 930, 934 (Mo. banc 1992) (citing *Batson v. Kentucky*, 476 U.S. 79, 96–99, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)). "A defendant's failure to challenge the State's race-neutral explanation in any way waives any future complaint that the State's reasons were racially motivated, and leaves nothing for this Court to review." *State v. Taylor*, 944 S.W.2d 925, 934 (Mo. banc 1997). Thus, the majority's holdings relating to venirepersons C.N. and V.G. are in direct contravention of this Court's precedent.

As for the remaining three venirepersons, a close review of the record shows that none were improperly stricken:

1. Venireperson C.W.

The state offered several race-neutral reasons for striking C.W.: (1) She was visibly distracted during *voir dire* and was distracting other venirepersons by not taking the *voir dire* process seriously; (2) her cell phone was ringing throughout the process; and (3) she maintained that it would be an unreasonable hardship to her employer to be without her service for the duration of the trial. On that last point, she had explained that she did not want to be on the jury because she needed her to fulfill her duties as an area manager. These are, of course, race neutral reasons for striking C.W.

According to the majority, however, venireperson S.R. was similarly situated but not stricken. The record does not bear out that conclusion. S.R. maintained that she did not want to be absent from work when her employer was going through an audit, but the trial court determined that the audit was not to take place until well after the trial was over. C.W. may well have been rightfully concerned about her employer, but S.R. should have had no concern about hers. Furthermore, unlike the situation with C.W., there was no complaint that S.R. was distracted and that her cell-phone was ringing during the proceedings.

2. Venireperson M.B.

The state's race-neutral reasons for striking M.B. were that: (1) she had some connection with a witness in the case; (2) she had several questions about accomplice liability that the prosecutor had not been able to resolve; (3) she was familiar with the Pine Lawn area where the murder occurred; and (4) her expectations of scientific evidence were too high. On appeal, the state now concedes that the prosecutor misspoke in offering the second reason concerning accomplice liability and that he had confused M.B. with another venireperson.

Regarding the state's first reason, M.B. had indicated that she knew a relative of a potential state's witness. The majority found fault with this first reason by arguing that any bias on the part of M.B. due to her connection with the witness would favor the state. This argument is self-defeating. If M.B. could be biased in favor of *any* party, it follows that this bias could serve as a race-neutral non-pretextual reason for the state to strike M.B.

The majority dismisses the third explanation by claiming that there were "five white venirepersons who also possessed familiarity with the area of the crime [but who] were not struck from the jury." However, these persons were not similarly situated because, unlike M.B., none of them had "present knowledge" of the Pine Lawn area.

Finally, the majority claims that the state's fourth reason is pretextual because M.B.'s high expectations concerning scientific evidence "would only strengthen the credibility of the State's fingerprint evidence linking McFadden to the crime." This misses the point altogether. As the prosecutor explained, there was little scientific evidence linking appellant to the crime, and he was fearful that M.B. would "expect more"—that she would have unrealistic expectations about the evidence

she believed the state ought to be able to produce. This is no proof of pretext.

3. Venireperson W.S.

The state's race-neutral reasons for striking W.S. were that: (1) he appeared agitated, confused and unwilling to be present; (2) he slept during portions of voir dire; (3) he appeared confused over how to handle conflicting witnesses; (4) he lived near Pine Lawn, but failed to express his familiarity with Pine Lawn; and (5) he refused to talk about his nephews, who were law enforcement officers. The state's second reason—that W.S. was asleep—is alone sufficient to justify the strike. In fact, the majority acknowledges as much, but then concludes that W.S.'s sleeping must be discounted "when examining the facts of the case in a larger context." No case is found, however, that holds, even in the "larger context," that a sleeping juror is not always subject to a peremptory strike, and in fact, the sleeping juror is most often the proper subject of a strike for cause.

Even without the sleeping juror problem, each of the state's other reasons for the strike were independently sufficient to justify the strike. The majority first addresses the state's concern over W.S.'s agitation and confusion by simply stating that "there is no indication that W.S.'s confusion would have impaired his ability as a juror." But given the trial court's superior vantage point on matters relating to the venireperson's demeanor, this Court must defer to the trial court's determination. And even if W.S.'s demeanor was not agitated, the fact that he appeared confused concerning the role of the jury is certainly a valid race-neutral reason for striking him.

Then, as with M.B., the majority suggests that familiarity with the Pine Lawn area was a pretextual reason for striking

W.S. However, just as with M.B., the majority again fails to explain exactly how W.S. was similarly situated with the venirepersons who were familiar with Pine Lawn and who were not stricken.

Finally, regarding the state's fifth reason—W.S.'s refusal to discuss his nephews' law enforcement experience—the majority concludes that, if anything, "his attitude toward law enforcement appears to be generally positive" and that "such an attitude is usually favorable to the state's position." This conclusion, of course, is speculation, and it may well be that W.S.'s refusal to discuss the matter may be caused by some dissatisfaction with his nephews' experience. In any event, the state's concern that a venireperson may be biased in one way or another toward law enforcement is a valid race-neutral reason for striking a venireperson.

## II.

Although I am concerned that five out of six black venirepersons were stricken, and though I agree that such a disproportionate removal of minority venirepersons can be an inference of discriminatory intent, that inference alone will not convert facially neutral explanations into *Batson* violations. *Parker*, 836 S.W.2d at 934. For the reasons stated, the state's explanations for its peremptory strikes were not "inherently discriminatory." I would hold that the trial court did not clearly err in denying the *Batson* challenges, and I would affirm the judgment.