**STATE of Missouri, Respondent,**

v.

**Lance W. LIVINGSTON, Appellant.**

No. WD 64677.

Missouri Court of Appeals,
Western District,
En Banc.

Jan. 30, 2007.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 27, 2007.

Application for Transfer Denied
May 29, 2007.

---

6. We added the emphasis.

Ruth Sanders, Appellate Defender Office, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Shaun Mackelprang and Daniel McPherson, Office of Attorney General, Jefferson City, for respondent.

RONALD R. HOLLIGER, Judge.

Lance Livingston ("Livingston") appeals his convictions of murder in the first degree and armed criminal action after a trial by jury. Livingston claims that the State improperly used a peremptory strike against a juror based on race. We reverse and remand.

### Factual and Procedural Background

On the evening of Sunday, January 12, 2003, Joshua Ivers was shot and killed outside of the Premier Bowl in Raytown, Missouri. On December 8, 2003, Livingston was charged as a prior felony offender in an information in lieu of indictment with one count each of murder in the first degree, section 565.020, and armed criminal action, section 571.015. After two mistrials to deadlocked juries, Livingston was convicted by a jury on July 9, 2004, in the Circuit Court of Jackson County, Missouri.

Livingston does not challenge the sufficiency of the evidence. Viewed in the light most favorable to the verdict, the record reflects that on Sunday, January 12, 2002, while Livingston and his friends, Keynan Beard and Ian Robinson, were at Beard's house drinking, Livingston showed Robinson a gun he had in his waistband. Later that evening, Livingston, Beard, and Robinson drove to the Premier Bowling Alley in Raytown, Missouri, in Robinson's green Camaro. The State's evidence was that an off-duty police detective, Raytown Police Detective Paul Beitling, who was working security observed the three men sneaking into the bowling alley through the side door and asked them to pay or leave. Livingston and his friends then left through the same door they had used to gain entrance.

The State also presented evidence that Joshua Ivers saw Livingston in the bowling alley. Ivers had been smiling and talking with his friends, but his facial ex-

pression changed when he saw Livingston. He appeared to his friends to be frightened. Ivers asked one of his friends to accompany him outside and to follow him home. In the meantime, Robinson and Beard came back into the bowling alley and Livingston remained in the parking lot.

Detective Beitling heard gunshots outside, ran into the parking lot, and saw Livingston behind the wheel of the green Camaro. Beitling ordered Livingston to stop, but Livingston said, "they've got a gun back there," and drove out of the parking lot. Ivers' body was found in the parking lot. He had been shot twice. Another Raytown police officer chased the green Camaro after it left the parking lot and saw the driver throw an object from the car. A gun was later recovered from the side of the road. At about 12:45 that morning, another officer saw three people in a red Hyundai stopped in the same area. The officer saw a fourth person run from the median and get into the car, and saw the car drive away. The Hyundai belonged to Livingston's aunt.

That night, Raytown Police Detective Dyon Harper learned that Robinson might be at Beard's house, and he found Robinson's green Camaro in the driveway with shell casings in it. Robinson and Beard were arrested. Robinson told the police that he had been with Livingston that night, but Beard's mother testified that Livingston was not present at her house that evening and that no one but Robinson was with her son when they left for the bowling alley in the green Camaro. Livingston's aunt testified that Livingston was at her house on the evening the crime occurred. In May 2003, Livingston was arrested in Brazoria County, Texas, and brought back to Jackson County.

The jury returned a verdict finding Livingston guilty of murder in the first degree and armed criminal action. On September 23, 2004, Livingston was sentenced to concurrent terms of life without parole for murder in the first degree and life imprisonment for armed criminal action. Livingston now appeals.

## Standard of Review

An appellate court reviews a trial court's ruling on a *Batson* challenge for clear error. *State v. McFadden*, 191 S.W.3d 648, 651 (Mo. banc 2006). A finding is clearly erroneous when the reviewing court is left with a definite and firm impression that a mistake has been made. *Id.*

## Discussion

Livingston claims that the trial court erred in overruling his *Batson* challenge to the State's peremptory strike of venireperson Fisher. A review of the record reveals Fisher was one of four African–Americans on the jury venire. The State exercised peremptory strikes against all four African–American venirepersons. The trial court sustained one *Batson* challenge but denied the other three of Livingston's challenges. As a result, one African–American served on the jury panel.

In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. *Id.* at 96, 106 S.Ct. 1712. The mechanics of enforcing the *Batson* principle were left to the states. In *State v. Parker*, 836 S.W.2d 930 (Mo. banc 1992), the Missouri Supreme Court developed a more unitary procedure for the vindication of *Batson* claims that better protects the equal protection rights of a defendant and facilitates the efficient

administration of justice in this state. *Id.* at 940.

In Missouri, when a defendant raises a timely *Batson* objection in response to the state's use of a peremptory strike against one or more specific venirepersons, the defendant is not required to make a showing of prima facie discrimination. *Id.* The defendant need only raise a *Batson* challenge with regard to one or more specific venirepersons struck by the state and identify the cognizable racial group to which the venireperson belongs. *Id.* at 939. The state must then come forward with a reasonably specific and clear race-neutral explanation for the strike. *Id.* A mere facially neutral explanation is not sufficient to satisfy *Batson.* *State v. Davis,* 894 S.W.2d 703, 706 (Mo. App. W.D.1995). If the state is able to articulate an acceptable explanation for the strike, the defendant must then show that the state's proffered reason for the strike was merely pretextual and that the strikes were racially motivated. *Parker,* 836 S.W.2d at 939.

The trial court must finally determine whether the defendant has carried the burden of proof and established the existence of purposeful discrimination. *Id.* The trial court should take into consideration a variety of factors, its chief consideration being the plausibility of the state's explanations in light of the totality of the facts and circumstances surrounding the case. *Id.* Facts or circumstances that detract or lend credence to the state's explanations are relevant. *Id.* Additional factors include the existence of similarly situated white jurors who were not struck by the prosecution, the degree of logical relevance between the proffered explanation and the case to be tried in terms of the crime charged, the nature of the evidence to be adduced, and the potential punishment if the defendant is convicted,

the prosecutor's demeanor or statements during voir dire, the demeanor of the excluded venirepersons, the court's past experiences with the prosecutor, and any other objective factors bearing on the state's motive to discriminate on the basis of race, such as the conditions prevailing in the community and the race of the defendant, the victim and the material witnesses. *Id.* at 940. The state's failure to use all of its strikes against venirepersons of a racial minority, or the presence of a racial minority on the defendant's jury are relevant only to the extent that they indicate that race was not the state's motive for the challenged strikes. *Id.*

During voir dire, the State asked the venire panel whether anyone was familiar with the Premier Bowl. Several venirepersons both white and non-white responded affirmatively. Venireperson Fisher stated that she was familiar with the area and that she bowled there in a league years ago. When asked if anything about the fact that she was familiar with the bowling alley would affect her ability to listen to the evidence, venireperson Fisher responded "no." Venireperson McDaniel (white) also stated that he also was in a bowling league there years ago and that it would not affect his ability to listen to the evidence.

Later, the State asked whether any of the venirepersons who had bowled at Premier Bowl had ever been there on a Sunday night. Venireperson Fisher responded that "all the leagues were on Sunday nights" when she was there in 1994 or 1995. Venireperson Fisher re-affirmed that she could set aside whatever prior knowledge she had about Sunday nights to listen to the evidence as it came from the witness stand. No one else on the venire panel responded that they had been there on a Sunday night.

After the State's exercise of its peremptory challenges, Livingston objected to the State's strike of venireperson Fisher because he believed that she was struck because she was African–American. The State responded that Fisher was "the only venire panel member who said that not only was she familiar with Premier Bowl but that she had bowled there on Sunday nights. There's going to be a great deal of testimony in this case regarding what happens at Premier Bowling Alley on Sunday night. The reason for striking her is the fear that she may hear something that is different from her recollection of how things are on Sunday nights at Premier Bowl."

In response, Livingston argued that the State's explanation was merely facially neutral and urged the court to look beyond the State's explanation to the totality of the circumstances. Livingston argued that the State's use of peremptory challenges against all four of the African–Americans on the venirepanel combined with the prosecutor's pattern and past history of using peremptory challenges against African–Americans at the previous trials was evidence that the State's explanation for the strike was merely pretextual and that the strike of venireperson Fisher was racially motivated.

In ascertaining the plausibility of the State's explanation in light of the totality of the facts and circumstances surrounding the case, the trial court asked whether there were similarly situated white venirepersons who were not struck by the State. The State told the court (falsely) that there were no white venirepersons who also had bowled at Premier Bowl who were not struck and reiterated that its reason for striking venireperson Fisher was not that she had bowled at the bowling alley, but that she was the only venireperson who had bowled there on Sunday

nights. Based on the foregoing, the trial court denied Livingston's *Batson* objection as to venireperson Fisher.

In denying the challenge, the trial court properly stated that a venireperson's independent knowledge of a scene or some other important part of the evidence is race neutral and a valid consideration to support a preemptory strike. We agree, *but that was not the race neutral reason that the State expressed in support of its challenge.* Again, the State's explanation was that venireperson Fisher might "hear something that is different from her recollection of how things are on Sunday nights at Premier Bowl." In fact, the questioning did not indicate that venireperson Fisher had *any* knowledge of the procedures used for all-you-can-bowl on Sunday nights at Premier Bowl. The voir dire did not indicate that venireperson Fisher had ever been to Premier Bowl during all you can bowl on Sunday or any other night. She had knowledge only of the procedures used in a Sunday league over ten years ago. In other words the voir dire examination indicated she *did not* have any familiarity with the procedures used on all-you-can-bowl nights on a Sunday or any other day of the week. In this respect she was identical to all members of the venire panel including several white members. And it was those very procedures that the State argues made all you can bowl nights and the Sunday night on which this crime occurred special.

The State's explanation for its strike lacks plausibility. It did not ask any member of the venire whether he or she had ever attended an all-you-can-bowl night at Premier Bowl or any other bowling alley. And although not its burden to do so it does not now articulate any reason why Fisher's familiarity with the bowling alley ten years ago in a league setting was not, as argued by the defendant purely pretex-

tual. Of course it cannot because there were other white venirepersons who were equally familiar with Premier Bowl and/or had bowled there. Although the State is technically correct that no other venireperson had been there on Sunday night, that distinction is clearly pretextual with regard to venireperson Fisher. Nothing in the record reflects that venireperson Fisher was in a position to have any more knowledge of the procedures used at Premier Bowl on Sunday nights during all-you-can-bowl than any other venireperson. What made the Sunday night that the crime occurred on significant was that it was all-you-can-bowl night, not that it was a "Sunday" night.

Because venireperson Fisher had no independent knowledge of the procedures used at Premier Bowl during all-you-can-bowl nights, all of the veniremembers who were also familiar with Premier Bowl, but who had not been there on all-you-can-bowl nights, were similarly situated to venireperson Fisher. "The existence of similarly situated white jurors who were not struck by the prosecution is certainly probative of pretext." *Parker*, 836 S.W.2d at 940. Venireperson McDaniel, like venireperson Fisher, was in a bowling league at Premier Bowl years ago. Seven other white venirepersons, including McDaniel, had also bowled at Premier Bowl but apparently (they were not asked) not on all-you-can-bowl nights. The existence of these similarly situated white jurors who were not struck is one factor supporting the conclusion that the State's race-neutral explanation was a pretext.

 The State relies on *State v. Marlowe*, 89 S.W.3d 464, 469 (Mo. banc 2002), in arguing that Livingston cannot be allowed to argue on appeal that other venirepersons besides McDaniel were similarly situated to Fisher because Livingston failed to allege that any white venireper-

sons other than McDaniel were similarly situated to venireperson Fisher at trial. *Marlowe* stands for the proposition that the State's post-hoc justifications for a peremptory strike are irrelevant. *Id.* at 469. The focus is on the plausibility of the contemporaneous explanation. *Id.* The State's reliance is misplaced. This court may consider facts and arguments related to a *Batson* challenge not presented to the trial court when the defense presents evidence at trial that the State's justifications were pretext. *Davis*, 894 S.W.2d at 707–08.

There are other factors discussed earlier that bear on our analysis. There is a low degree of logical relevance between the State's explanation for its peremptory strike of venireperson Fisher and the case to be tried. The procedures used on all-you-can-bowl nights had little or no significance to the outcome of the case in light of the fact that none of the venirepersons had any familiarity with the procedures used on all-you-can-bowl nights. Further, the shooting occurred in the parking lot, not inside Premier Bowl. The procedures used on all-you-can-bowl nights were not instrumental in the commission of the crime. Moreover if its real concern was familiarity with the scene the prosecution would have moved to strike all of the jurors, white and African–American, for cause. That motion would have been addressed to the courts' wide and virtually unreviewable discretion in sustaining a motion to strike for cause.

We are also to consider the prosecutor's credibility based upon her demeanor or statements made during voir dire as well as the court's past experiences with the prosecutor. *Parker*, 836 S.W.2d at 940. At trial, Livingston argued that there was a pattern of discrimination because, in his previous trial, the prosecutor had struck African–Americans from the venire panel

because they did not talk during voir dire. There is nothing in our record that supports that allegation. Livingston also argued that the prosecutor's failure to extensively question other veniremembers who were familiar with Premier Bowl indicates that the State was not particularly concerned about jurors being familiar or unfamiliar with the atmosphere in the Premier Bowl. Most significantly, however, in addressing the very next *Batson* challenge, the prosecutor advanced a reason so pretextual that the court sustained Livingston's objection with the only response from the defendant being that he would not dignify that (the State's claimed race neutral reason) with a response. After this ruling Livingston again asked the court to reconsider the strike of venireperson Fisher. The State admitted at oral argument that the judge overruled the second preemptory strike on the basis of *Batson* but contends that the trial court was wrong. Whether or not incorrect the sustaining of the second *Batson* challenge indicates a belief by the court that the strike was racially motivated. The State also argues that because the trial judge was familiar with the prosecutor as well as the evidence to be presented at trial,[1] it is logical to conclude that the trial judge found the prosecutor to be credible. The trial court made no such finding, and it would be inconsistent with the trial court's quick conclusion that one of the other strikes of an African–American was racially motivated.

In addition to the prosecutor's credibility, we must consider the demeanor of the excluded venireperson. *Parker*, 836 S.W.2d at 940. Venireperson Fisher was asked on two occasions whether she would be able to set aside whatever prior knowledge she had and listen to the evidence solely as it came in from the witness stand to which she responded yes. The State does not argue and there is nothing apparent in the record concerning her demeanor that would support the State's strike.

Finally, the totality of the facts and circumstances surrounding the case demonstrate the State's proffered reason for its peremptory strike was pretextual. The existence of similarly situated white venirepersons who were not struck coupled with the low degree of logical relevance between the State's explanation and the case to be tried is a strong indication that the State's explanation was pretextual. The race of the defendant, African–American, and the race of the victim, Caucasian, in addition to the fact that the State attempted to strike all African–Americans from the venire panel and the finding that another strike by the State was racially motivated lends additional support to the conclusion that the State engaged in purposeful discrimination.

Since *Batson* was handed down it has been in tension with the historical conviction of the trial lawyer that he or she should be able to make preemptory challenges for no reason or even bad reasons. But there should be no tension. Every citizen has a right as well as obligation to participate in our democratic process. Jury service is perhaps the most important means after voting and free speech. Consequently, as a matter of constitutional right and fundamental equality, an African–American has a right to serve on a jury that can only be impaired for cause or legitimate and rational reason through a preemptory strike. By comparison no litigant has a right to have any particular person on a jury or to exclude someone for

---

1. The trial judge had presided over one of the previous trials that had resulted in a hung jury.

a jury for an impermissible and discriminating reason. This is not a situation of competing valid interests. The right of a party to peremptorily strike a juror must always give way to a right of citizen to participate in our judicial system without regard to race, gender or national origin. To do otherwise undermines the respect for the rule of law upon which a peaceful democracy is based.

*Batson* did not with a stroke of the pen end prohibited biases in jury selection nor did it eliminate the innate beliefs by some lawyers that individuals because of their identification with a group would favor one side or the other in a lawsuit. We believe the court's ruling was based upon misrepresentations by the State as to the existence of similarly situated venirepersons and the state's facially attractive but logically and factually unsupported justification was clearly erroneous.

The case is reversed and remanded for a new trial.

HAROLD L. LOWENSTEIN, Judge, ROBERT G. ULRICH, Judge, PAUL M. SPINDEN, Judge, JOSEPH M. ELLIS, Judge, and THOMAS H. NEWTON, Judge, concur in majority opinion.

VICTOR C. HOWARD, Chief Judge, dissents in separate opinion.

PATRICIA A. BRECKENRIDGE, Judge, EDWIN H. SMITH, Judge, JAMES E. WELSH, Special Judge, and NANCY RAHMEYER, Special Judge concur in dissenting opinion.

VICTOR C. HOWARD, Chief Judge, dissenting.

Livingston registers disagreement with only one of the four *Batson* rulings. The record does not support the majority's belief that the trial court's ruling was based upon an "unsupported justification" and "misrepresentations by the State." The trial judge saw and heard firsthand everything that occurred during voir dire. And, far from exposing a detached and misled trial court, the transcript reflects one that is knowledgeable and engaged. With a considerable degree of detail, the trial court cited and explained relevant case law and applied that law to the facts of the case. Furthermore, the majority's perceived inconsistency in the State's explanation for the strike is given far more weight than it can bear.

The majority's opinion smacks of *de novo* review and drifts far from the standard we use to review *Batson* rulings. The trial court's ruling "is entitled to great deference on appeal" and will be reversed only if "clearly erroneous" leaving "the definite and firm impression that a mistake was made." *State v. Cole*, 71 S.W.3d 163, 172 (Mo. banc 2002). Appropriate deference is given because "a finding of intentional discrimination is a finding of fact." *Batson v. Kentucky*, 476 U.S. 79, 98 n. 21, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (citation omitted). Because weighing the legitimacy of the State's explanation for a peremptory strike is, by nature, a subjective exercise, "we place great reliance in the trial court's judgment." *State v. Morrow*, 968 S.W.2d 100, 114 (Mo. banc 1998) (citing *State v. Antwine*, 743 S.W.2d 51, 65 (Mo. banc 1987)). Deference is given to the trial court's decision because the "evaluation of the prosecutor's ... credibility lies 'peculiarly within a trial judge's province.'" *Hernandez v. New York*, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (citations omitted). Credibility determinations involve intuition and the consideration of intangibles such as demeanor. Accordingly, it is much more difficult to determine whether a prosecutor purposefully engaged in racial discrimination with only the black and white pages of the appellate record before us. The urge to

second-guess should not be indulged lightly.

As pointed out by the majority, once a *Batson* challenge is lodged (step one), the State must promote a race-neutral explanation for the strike (step two). In the third step, the defendant carries the burden to prove that the explanation was pretextual and, in fact, the true reason for the strike was purposeful racial discrimination. "The second step of this process does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 768, 115 S.Ct. 1769 (citations omitted). "It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Id.* Livingston agrees that the State's explanation was race-neutral and not inherently discriminatory. The focus of the inquiry, therefore, shifts to *whether Livingston carried his burden* to prove purposeful discrimination.

The majority uses three main bases to conclude that the State engaged in purposeful discrimination: the State's attempt to strike all African–Americans from the venire panel; white panel members similarly situated to Ms. Fisher were not struck; and there was a low degree of logical relevance between the explanation and the case to be tried.

The majority notes that the State attempted to strike all four African–Americans and emphasizes, "[m]ost significantly" the trial court made a finding that one of the strikes "was racially motivated." However, the trial court never made that explicit finding and sustained the challenge without comment.[1] The transcript demonstrates that the trial court spent significant time and attention evaluating and ruling on the four challenges. Livingston agrees with three of the four *Batson* rulings. Viewed either individually or as a whole, the process employed reflects a careful exercise to weigh the motive and intent of the prosecutor.

A second basis the majority employs to find purposeful discrimination is the "existence of similarly situated white jurors who were not struck." While other jurors said they visited the Premier Bowl, only Ms. Fisher indicated that she had bowled at the alley on Sunday nights. The majority acknowledges this is "technically correct" but considers the distinction "clearly pretextual" because Ms. Fisher did not indicate a familiarity with all-you-can-bowl nights. However, that misses the point of the strike—that the current Sunday night all-you-can-bowl atmosphere would be *different* from Ms. Fisher's independent knowledge of the Sunday night procedures when she used to bowl at the alley.

The prosecutor clearly delineated the importance the State placed on the difference in several portions of the transcript. For example:

The State's reason for striking Venireperson No. 2 is that she was the only venire panel member who said that not only was she familiar with Premier Bowl but that she had bowled there on Sunday nights. There's going to be a great deal of testimony in this case regarding

---

1. The State's reason for striking was that the venireperson wanted to hear the defendant testify.

what happens at the Premier Bowling Alley on Sunday night. The reason for striking her is the fear that *she may hear something that is different from her recollection* of how things are on Sunday nights at Premier Bowl. (Emphasis added.)

. . . .

That's when this crime occurred. And as the Court will recall from the last trial, and as will come in in this trial, Sunday nights are—it's—something unusual happens on Sunday nights at Premier Bowl. They let, you know, everybody in. All you can bowl for $8, and they lock all the doors but the front door, and people notoriously sneak in the side door.

. . . .

And I made that distinction when I first said why we struck her, that she was the only juror who said she had bowled on Sunday nights. I did not say it was because she had been in Premier Bowl.

The majority's quarrel speaks more to its perception of the tactical effectiveness of the prosecutor's explanation than its genuineness. Even assuming a legitimate disagreement over tactics and the impact of certain evidence, that certainly does not establish that the prosecutor was racially motivated to discriminate. As long as the prosecutor's explanation is racially neutral, "past experience, 'hunches,' or 'horse sense,'" are legitimate justifications. *State v. Smith,* 944 S.W.2d 901, 912 (Mo. banc 1997) (citing *State v. Kempker,* 824 S.W.2d 909, 911 (Mo. banc 1992)). Furthermore, "the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." *Batson,* 476 U.S. at 97, 106 S.Ct. 1712.

The majority also finds that there "is a low degree of logical relevance between the State's explanation for its peremptory strike of venireperson Fisher and the case

to be tried." The trial court, which was very familiar with the case, clearly found relevance in the State's reason for the strike. The trial court stated:

> Well, I'll tell you my thinking on Venireperson No. 2. And in part it is based on my recollection from the last trial of this case—I wouldn't say the first trial since it was actually the second trial—but my recollection is that there was considerable testimony about how Sunday nights differed from other nights at Premier Bowl the procedures that were used. And somebody who is in a position to maybe have independent knowledge of those procedures other than what they hear on the witness stand I think bears a reasonable relationship to how the evidence may be judged by people who are on the jury.

It is certainly possible to second-guess counsel and the trial court regarding the relevance of Ms. Fisher's prior knowledge. But we are not evaluating counsel's competence or the validity of trial strategy. Instead, at issue is the motive and intent of the prosecutor.

Perhaps, had we been there, we would have decided differently. But, we do not review *de novo.* Instead, trial judges are "vested with considerable discretion in determining whether the defendant established purposeful discrimination." *State v. Parker,* 836 S.W.2d 930, 934 (Mo. banc 1992). In this instance, the high ground of the appellate court does not yield a view superior to that of the trial court's.